74   441
78   441

---

## M. L. Dimmitt v. J. N. Robbins.

### No. 5757.

1. **Change of Venue.**—An order of the District Court changing the venue of a cause confers jurisdiction on the court to which the cause is sent if the order is based on the existence of any of the statutory causes for changing venue.

2. **Same.**—When the order changing venue recites that it was made on motion of defendant, and it appears that the order was based on the existence of a cause which under the law authorized the change, the recitation will not affect the jurisdiction if an inspection of the proceedings shows that the change of venue was ordered on plaintiff's motion, supported by affidavits.

3. **Examination of Witness.**—A witness can not be cross-examined as to a fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him.

4. **Contract Under Duress.**—If one who is attacked by robbers who threaten his life and subject him to duress, borrows money from a third person with which to free himself from their power, he is responsible for its repayment and the implied contract to repay it may be enforced.

5. **Fact Case.**—See this case for facts which were held insufficient to sustain a verdict in favor of one who sued to recover money claimed to have been advanced to relieve defendant from duress.

Appeal from Travis. Tried below before Hon. A. H. Graham, Special District Judge.

The opinion states the case.

*T. E. Sneed, A. W. Terrell,* and *Hughes & Key,* for appellant. — 1. The defendant J. J. Dimmitt having made no application for a change of venue from Williamson County, the District Court of that county had no authority to make the order it did changing the venue upon the motion of the defendant, and it being made to appear to the District Court of Travis County by the record and the affidavit of said Dimmitt that he had made no such motion, the court should have dismissed the case and stricken it from the docket.

2. Dimmitt's testimony being in effect that he had no knowledge of Robbins having with him a large sum of money at the time he testified that he let him (Dimmitt) have $2500, and Robbins having testified that Dimmitt caused him to go home and get the money and carry it on the trip, the court erred in excluding the depositions of David H. McFadin

and John N. McFadin showing that Robbins had stated to them that no one but his wife knew that he had the money with him on the trip, because said testimony tended to impeach the credibility of Robbins, the plaintiff and principal witness for himself.

3. If appellee furnished money to Dimmitt and Dimmitt agreed or promised to pay it back, or if appellee with Dimmitt's consent or approval paid money to others for Dimmitt, and at the time of such agreement, promise, or payment Dimmitt was unlawfully restrained of his liberty by men armed with pistols who were assaulting him or threatening to take his life or to inflict upon him serious bodily injury, and such restraint, assault, or threats were calculated to put a person of ordinary nerve in fear of losing his life or of serious bodily injury, then Dimmitt was in duress,. incapable of making a valid contract, and can not be held responsible to appellee for said money, whether appellee was responsible for the duress. or not, and the court erred in charging the jury otherwise, and in refusing to give special instructions embracing this proposition of law. 1 Story on Con., secs. 393, 400; 1 Story Eq. Jur., sec. 239; Wright v. Remington, 32 Am. Rep., 180; Vander Hoven v. Nettie, 32 Texas, 183;. McGowen v. Bush, 17 Texas, 195; Phelps v. Zuschlag, 34 Texas, 380;. Olivari v. Menger, 39 Texas, 76; Cook v. Moore, 39 Texas,. 255; Walker v. McNeils, Dall., 541.

4. The evidence in this case, taken all together, clearly shows that. appellee was a conspirator with and confederate of the two men who assaulted Dimmitt on the occasion when appellee claims to have loaned him the money sued for, and that said assault was made with appellee's previous knowledge and approval and by his procurement, for the purpose of affording him an opportunity to pretend and claim that he had loaned Dimmitt a large sum of money, and therefore the verdict of the jury is. contrary to and not supported by the evidence, and the court erred in. not setting aside the judgment and granting appellant a new trial.

*Walton, Hill & Walton,* for appellee. — 1. The use of the word "defendant" in the order of the court changing the venue in the case from Williamson to Travis County, in effect reciting that the order was made on the application of "defendant," is a patent clerical error. Hanrick v. Jackson, 55 Texas, 29, and authorities there cited.

2. The issue on which the impeaching testimony was sought was a side issue, an immaterial collateral issue, and did not reach the merits or any part of the merits of the case. The question was, did appellee have the money, and did he lend it as alleged to J. J. Dimmitt? 1 Greenl. on Ev., sec. 449, and notes 6 and 7, also sec. 462; Walker v. State, 6 Ct. App., 602; Reynold's Stephen on Ev., art. 131, and authorities in note B.

3. If J. J. Dimmitt was in duress at the time that the debt sued for was contracted, yet the duress was without the connivance, consent, and

assistance, counseling, or advice of appellee, and the money was advanced at the request of Dimmitt to ransom his life from those who had him in duress threatening his life, to whom appellee was a stranger.    Diller v. Johnson, 37 Texas, 47; Tally v. Robinson, 22 Gratt., 388; Baltimore v. Leffeman, 4 Gill, 425; Brumagin v. Tillinghast, 18 Cal., 265; Mays v. City of Cincinnati, 1 Ohio St., 268; 6 Wait's Act. and Def., p. 653, sec. 3; Green v. Scranage, 19 Ia., 46; Pom. Eq. Jur., sec. 948, and note 1, also sec. 950.

4.    The evidence on all material points save as to the actual robbery was very conflicting.    The jury found for the plaintiff.    Briscoe v. Bronaugh, 1 Texas, 340, and all cases since.

HOBBY, JUDGE.—We have been unable to find in our researches among the great multitude of reported civil cases any case which in its facts is similar to this.    The suit was brought by the appellee, plaintiff below, on the 9th of August, 1877, against J. J. Dimmitt to recover $2500, alleged to have been loaned by appellee to Dimmitt.    Dimmitt denied the indebtedness, and alleged that if he ever agreed or promised to pay said sum he was in duress at the time and held in unlawful custody and in great fear of serious bodily injury and of losing his life by two men to him unknown, who armed with deadly weapons were threatening to kill him, and were making an unlawful and violent assault upon him.    That by reason of which duress, threats, and violence he was put in great fear of personal injury and of death, and his will and volition destroyed and he rendered incapable of entering into a valid contract or making a binding promise.

That if he ever undertook, promised, or agreed to pay plaintiff any money, which is denied, he was at the time in duress and held in unlawful custody and in great fear of losing his life by two men to defendant unknown, and by plaintiff.    That with the knowledge, consent, and approval of plaintiff, and by his procurement and at his instigation, said two men, to defendant unknown, made an assault upon him with deadly weapons and threatened to take his life unless he paid them a large sum of money, and put him in duress and great fear of losing his life and of serious bodily injury.    That while said two men were assaulting defendant and holding him in duress and unlawful custody, plaintiff handed them an envelope or package pretending that it contained $2500 in money, and pretending that he was paying it as a ransom to secure the release of defendant, when in truth and in fact it did not contain any such sum of money, and was not in good faith given by plaintiff as a ransom for defendant, but was given to plaintiff's confederates and coconspirators who were assisting plaintiff in his wrongful and fraudulent efforts to impose upon and deceive defendant and make him believe that he had been attacked by robbers unknown to plaintiff and that plaintiff had actually

and through proper motives given them $2500 as a ransom for defend-ant's life.

That the said acts of plaintiff and his confederates, the said two men to defendant unknown, were done and committed by previous agreement and understanding entered into by and between them for the wicked, wrongful, and fraudulent purpose of imposing upon and deceiving defendant, and causing it to appear and him to believe that he had in fact been assailed by robbers without the knowledge and consent of plaintiff and that plaintiff had paid $2500 to ransom him, and thereby to enable plaintiff to demand and receive from defendant said sum of $2500. Wherefore defendant says that plaintiff, being a confederate of and a conspirator with said two unknown men and pretended robbers, is not entitled to recover upon any promise, direct or implied, which defendant may then and there have made.

The plaintiff Robbins filed a motion for a change of venue on July 19, 1881, sworn to on December, 1881, upon the ground that there existed so great a prejudice against him in Williamson County that he could not obtain a fair trial of the cause, etc. The cause was transferred to Travis County by order of the court, the order reciting that it was made on motion of the *defendant*. On April 15, 1884, a motion was filed in the District Court of Travis County to strike the cause from the docket because it appeared to have been changed from Williamson to Travis on motion of defendant, when in fact no such motion was made by him. This motion was accompanied by affidavits verifying the fact stated in the motion.

On March 16, 1885, plaintiff filed first amended original petition, alleging the death of defendant J. J. Dimmitt, and that Mrs. M. L. Dimmitt was his surviving wife and had qualified to administer the community estate of said J. J. Dimmitt and herself, and making her a party defendant herein, and in addition to the prayer of the original petition prayed for judgment against said community estate and for interest after demand, and for general and special relief. Mrs. M. L. Dimmitt answered by general denial and by adopting the answer of J. J. Dimmitt. She also pleaded the statute of limitation by exception and plea, to any recovery of interest for more than two years prior to the filing of the amended petition.

The district judge being disqualified, and also the special judge who had previously been appointed, Hon. A. H. Graham was duly appointed and qualified as special judge to try the cause, and on the 25th, 26th, 27th, 28th, and 30th March, 1885, the cause was tried, which resulted in a verdict and judgment for plaintiff Robbins for the sum of $2500 principal and $1528.21 interest thereon from August 9, 1877, aggregating the sum of $4028.21, with interest from the date of judgment at 8 per cent, which was decreed to be a valid claim against the community estate of

J. J. Dimmitt. From this judgment this appeal is prosecuted upon fifteen assignments of error, which we do not think it necssary to consider seriatim.

The first and second assignments complain of the refusal of the court to strike the cause from the docket of the District Court of Travis County, because it appeared that the order of the District Court of Williamson County reciting that the change of venue was made on motion of the defendant was not true in fact, the defendant not having made such motion. The order of the District Court of Williamson County changing the venue clothed the District Court of Travis County with jurisdiction, unless it appeared that this order was not predicated upon some one or more of the statutory grounds authorizing the change to be made. The recital in the order of the court that it was upon motion of the defendant might have been stricken out, and still the District Court of Travis County would have had jurisdiction. The original papers transferred disclosed the fact that its jurisdiction attached upon the motion of the plaintiff supported by proper affidavits as provided by the statute. If there was no power in the District Court of Williamson County to make the order it is not shown by the motion, or the assignments, or any bill of exceptions taken at the time to the order changing the venue.

During the progress of the trial Robbins was asked upon cross-examination by defendant's counsel if he had not stated out of court to one David H. McFadin and to one J. W. McFadin, "that no person knew prior to the robbery that you had the $2500 in money along with you except you and your wife?" To which the witness replied that "he did not tell McFadin that nobody knew he had this money but himself and wife, and knew exactly what he told McFadin," etc.

He was also asked if he had not made a similar statement to John McFadin, to which he replied that if he said anything to said John McFadin "it was likely that he had told him that no one else except his wife knew that he had taken the money along with him." The depositions of these parties were then offered by the defendent to the effect that "Robbins had about ten days or two weeks after the robbery said to them that he had about $2500 with him on the trip; that no person knew prior to the robbery that he had the money with him except his wife." To the introduction of this evidence by the defendant the plaintiff's counsel objected on the ground that the matter of fact involved in the supposed contradiction was immaterial, and that plaintiff's testimony could not be impeached in the manner indicated." The objection was sustained, and defendant assigns the ruling as error. Applying the strict rules of law regulating the cross-examination of a witness, we can not say that the court erred in the exclusion of the testimony offered. It seems to be a well settled principle that a witness can not be cross-examined as to any

fact which is collateral and irrelevant to the issue merely for the purpose of contradicting the witness.   1 Greenl. on Ev., sec. 449, and cases cited.

The issue to be tried in this case was whether Robbins loaned the sum of $2500 to Dimmitt, as claimed by him, and whether, as alleged, Robbins was in any manner connected with or instrumental in putting Dimmitt in a state of duress and illegal restraint, and in which condition Dimmitt contracted the obligation, as pleaded in the answer?   The fact that Robbins did or did not state to David McFadin and John McFadin that no one except his wife knew that he had the money along with him would not have contributed in any degree to prove or disprove either of these issues, and consequently it was a fact collateral and irrelevant to the issue being tried.

The charge of the court we think contained a correct presentation of the law applicable to the facts of the case, and it is not justly obnoxious to the many criticisms presented for our consideration in the several assignments relied upon.   Duress was correctly defined by the court to be "an actual or threatened violence or illegal restraint of a man's person to compel him to enter into a contract or to do some act which in the absence of such violence or restraint might be valid or legally effective.".

The jury were then instructed that "if Dimmitt was assaulted by armed men, who by a display of weapons and by threats and other acts such as would naturally operate on a person of ordinary firmness to inspire apprehension of great bodily injury, and was thus intimidated and coerced to comply with their illegal demands, he (D.) was under such circumstances in duress, and as to any one responsible in any degree for such acts of violence and illegal restraint, or engaged in aiding and abetting in such intimidation and coercion, he was deprived of all power to make any valid, binding contract or incur any legal obligation by his agreement or acts."

This was followed by the instruction "that if Dimmitt was in such a state of duress and called on Robbins to advance for him the money to meet the demands of his assailants, or accepted or authorized plaintiff's offer of money for that purpose, and that plaintiff did advance the money, and the jury found that plaintiff had previous knowledge of the contemplated attack on D., or had any share or complicity in it, or aided or abetted the assailants at or before the time, they would find for the defendant."

The jury were also told "if they believed plaintiff had prior to the time of the assault upon D. entered into any conspiracy or understanding with others for the purpose of having D. assaulted and putting him in fear of great bodily injury or death, with a view to extorting money from him, and that in pursuance thereof D. was so assaulted, etc., and plaintiff furnished D. with the $2500 or any sum to pay the assailants, and D. accepted it under the belief that it was necessary to save his

life or to prevent serious bodily injury, then in that event plaintiff could not recover."

The effect of the proposition contended for by the appellant is that if the obligation was contracted by D. while assailed by parties threatening to do him serious bodily injury or to take his life, that he was incapable of exercising his free agency, his power of withholding his assent was destroyed, and the obligation contracted was void, regardless of the fact of any participation in or knowledge of the circumstances upon the part of the plaintiff which resulted in this condition or state of duress.

In treating of the elementary rules governing contracts, and discussing one of the essential elements in a contract or obligation, that of the consent of the party or his want of liberty, it is said by Pothier (Obligations, vol. 1, p. 115, sec. 21), "when the violence is committed by the person with whom I contract or by his participation, the agreement is not binding either by the civil law or the law of nature; for supposing that there resulted any obligation from me to you in consequence of my consent extorted by violence, the injustice committed by you in exercising that violence obliges you to indemnify me for the injury I suffer by it, and that indemnity consists in discharging me from the obligation which you have obliged me to contract."

Continuing he says: "When the violence is exercised by a third person without the participation of him with whom the contract is made the civil law does not withhold its assistance. It rescinds all obligations contracted by violence, from whomsoever the violence proceeds." And he quotes Grotius as maintaining that, in the case last cited, it is only by the authority of the civil law that a rescission can be had of that which by the rules of the natural law would be binding.

On the other hand, Puffendorf and Barbeyrac he cites as holding that even by the rules of natural law, when a contract is the result of violence, it is not obligatory though the other party was not included in the violence. But an exception to the rule that consent extorted by violence is not sufficient to support a valid obligation of giving or doing anything we promise is mentioned in the case "where an obligation, though contracted under the impression of fear arising from violence, is notwithstanding valid. *That is, when I promise something to a person for coming to my assistance and delivering me from the violence which is exercised against me. For example, if being attacked by robbers I descry a person to whom I promise a sum of money for delivering me out of their hands. This obligation, though contracted under the fear of death, is valid."* Such we understand to be the correct rule, and we are of opinion that the instructions requested were properly refused, and those given by the court embodied the correct principles of law applicable to the facts of this case.

The facts of the case show that on July 2, 1877, Robbins was and had

been indebted to Dimmitt in the sum of $2500; that Dimmitt was urg-
ing a settlement of this debt; that R. had given D. to understand that.
when he realized money from the sale of some cattle he would settle it.
Robbins received the money he was expecting from this source, and it.
was paid to him at Austin (the sum of $2688.28). With this amount he
returned to his home near Georgetown, where both parties lived. Rob-
bins was residing upon a place owned by Dimmitt, for which he was
paying him rent. This place was formerly owned by one Jim Smith.
It appears to have been sold at forced sale and Dimmitt became the pur-
chaser. The parties, Robbins and Dimmitt, had been contemplating a
trip to Coryell County for the purpose of examining a tract of land there
owned by Dimmitt, for which Robbins was expecting to exchange land
owned by him in Williamson County.

When Robbins returned from Austin with the money referred to, which
was on the Saturday preceding the Monday they were to start on the
trip, he went to Dimmitt's place on the opposite side of the town and
urged that they should start on the trip to Coryell County on the next.
Monday. To this proposition Dimmitt objected because his wife was.
absent and it would require some time to get some person to remain with
his children and take charge of his home. Robbins insisted that if they
did not start on Monday he would not go at all. Dimmitt finally agreed
to go. There was some controversy between them as to the route to be
traveled, Dimmitt desiring to go by Liberty Hill to see a tract of land
owned by him and Robbins insisting on going by a place known as.
Youngsport, assigning as a reason that he desired to see a Dr. Runnells
at that point for the purpose of obtaining some eyewater, he being
afflicted with some affection of the eyes. He was then also just recover-
ing from pneumonia and not physically robust.

Just before starting from Georgetown, on Monday morning, July 2,
1877, Dimmitt's son, a boy twelve or fifteen years old, insisted on being
allowed to go on the trip. Robbins was opposed to his going, but finally
assented. It was discovered by Dimmitt at this juncture that he had left
his pistol and shot gun at home, and he proposed to send the son back
after them. Robbins expressed the opinion that there was no occasion
to take arms with them. Dimmitt, however, sent for and obtained his
pistol, which the evidence shows had been long used about the place for
his purpose of killing stock, and was in excellent and reliable condition.
Before starting Dimmitt told Robbins he must have $150 to make a pay-
ment to some one then pressing him for that amount. Robbins, it ap-
pears, then went back to his home and, as he says, got from the envelope
containing the money ($2688.28) he had received at Austin the sum of
$150 which he paid to Dimmitt. It is also in proof that just before start-
ing Robbins also paid Rucker & Hodges, to whom he was indebted, the
sum of $55.

Robbins says this money brought from Austin was all the money he had with him. He says that upon paying Dimmitt the $150 he (Dimmitt) suggested that it would be unsafe to leave the money he had collected at Austin at home, whereupon he returned home again and got the envelope, which he testifies contained exactly $2500 after the payment of $150 to Dimmitt, and that he put it in the hack.

There is a conflict in the evidence here between Dimmitt and Robbins, the former denying that he had any knowledge whatever of the fact Robbins had $2500 in the hack. The road traveled by the parties was in opposition to the wishes of Dimmitt. Robbins insisted upon it and Dimmitt acceded. It was shown by the evidence to be seven or eight miles further by the route traveled to Youngsport, the locality Robbins insisted upon going to, than by the direct public road to the same point.

In the evening and a short time before reaching the place where the parties camped two men were seen by Dimmitt, who was driving, some distance off and near a deserted house. When D. saw them, being uncertain as to the road they were in, he attempted by driving faster to overtake them, but the men, who were dismounted, hurriedly saddled and mounted their horses and disappeared. Dimmitt referred to the peculiar conduct of the men and expressed to Robbins his apprehension as to their meaning. At this juncture Robbins asked D. "if he knew that Jim Smith had written a letter to one Joe Sterling at Georgetown stating that he would get him (D.)?" Dimmitt replied that he had not, and asked Robbins "when he had heard it?" to which the latter said, "About six month since." After the parties had camped that night two armed men rode up. Dimmitt became uneasy and went to the hack to get his pistol, which he found was for the first time, as far as the evidence shows, in many years out of order and that it could not be used.

Just before this it seems Robbins had gone to the hack and remained some moments. He testifies he was transferring the money he had put in his saddlebags to the hack box at D.'s suggestion. The witness Clide (D.'s son) states that "Robbins had asked D. if he could put his things in the hack box," and that Robbins went to the hack and dropped an envelope in the hack box. He did not see R. put anything else in the box. Dimmitt referred the men, who had ridden up and requested supper, to a house a short distance off, but they declined to go. About that time Robbins proposed to make some coffee for them. These men then hitched their horses, and as Robbins and Dimmitt's son were preparing the supper the smaller of the two men, with an oath, commanded Dimmitt to throw up his hands, and demanded $5000 from him, saying that he (D.) had swindled Jim Smith, and that unless he paid that sum they would kill him. D. told them he did not have it. R. told them he and D. did not have it, but the small robber replied to D. that they would take his life if he did not pay that amount.

Dimmitt told them he had only about $35, and drew his purse and handed it to the robber, who threw it upon the ground and told him that $5000 was what they wanted.

Robbins in the meantime started towards Dimmitt and told the robbers, so he testifies, that D. had no money. They cursed him and told him to "stand back," that "they did not know him, and did not want to." Robbins then asked to be allowed to speak to his friend D., which was granted. He then went up to D. and said to D.: "Come here," and says he "may have taken D. by the hand." At this point the attacking party interfered and said: "No, you can't take him away from here." Then Robbins requested that he be permitted to *whisper to Dimmitt*, and this privilege was permitted. He then whispered, in the presence of and in close proximity to the robber, to Dimmitt: "Here is that money, and if you want to use it do so." Robbins states that D. told him to bring the money, and he went to the hack, got it, and handed the envelope to D. or the robber, which was seized simultaneously by the two, Dimmitt taking it between his thumb and fingers. The robber took the envelope from D., the latter insisting that the money should be counted, but the robber replied that "it was no time to count money," and the two men then rode off. Robbins testifies that the money in the envelope amounted to $2500, and was in $5, $10, and $20 bills.

The proof was not disputed that Jim Smith, the party in whose behalf the robbers had interested themselves, was then living in the State of Colorado; that he entertained no ill will toward Dimmitt; that he had written no such letter to Joe Sterling as that mentioned by Robbins; that he never authorized any one to demand $5000 from Dimmitt.

It was also proved by Sterling that he had never told Robbins that he had received such letter. From the testimony of Dimmitt it appears that he did not want to camp at the place. He desired to stop at the house a mile or two from there, occupied by Blalock. This he states was opposed by Robbins. When they reached the camp ground D. insisted on going on to Youngsport, about four miles distant, but Robbins urged that they should camp there. This is denied by Robbins.

The thirteenth, fourteenth, and fifteenth assignments present for our consideration the sufficiency of the foregoing facts to support the judgment in this cause. In cases of this character, where suit is brought for money loaned and advanced, there should be no reasonable doubt arising from the testimony as to the amount of the defendant's indebtedness. The burden of establishing this fact the law casts upon the plaintiff, and it should be made to appear by such evidence as is reasonably sufficient to satisfy the mind. In other words, we do not think the mind should be left in perplexity and doubt as to what sum, if any, was, as claimed by the plaintiff, advanced for the benefit or at the instance and request of the defendant and actually received by him. The only evidence of

what amount was in the envelope is that of Robbins. He states that it contained $2688.28, the sum he had received at Austin. He says that before starting from Georgetown he paid Dimmitt out of it $150. This would leave $2538.28. It is not controverted that he also paid the firm of Rucker & Hodges, to whom he seems to have been indebted, on the same morning before starting the sum of $55. Still Robbins says there was $2500 exactly in the envelope, which could not have been so unless he paid Rucker & Hodges out of some other money, which is not shown by the evidence. On the contrary, he says this was all the money he had with him.

Robbins might have recovered a less amount than that sued for or than was contained in the envelope. But this does not affect the question of the sufficiency of the evidence to establish the fact that he had advanced the sum of $2500 to Dimmitt. This was a material fact to be established. Robbins' evidence shows that the amount he claimed to have advanced was never ascertained. It was not counted when demanded by Dimmitt. Although he states that D. said there was $2500 in the envelope he admits that D. could not have known that fact, and did not believe or accept it as containing that sum. There should be some evidence tending to show that D. knew or had the opportunity of knowing what was the character and amount of the obligation he had contracted.

If the verdict could be sustained otherwise we do not think it is supported by any evidence satisfactorily showing that the sum of $2500 was loaned by the plaintiff to the defendant Dimmitt at the latter's request. Independently of this we think that the verdict is manifestly against the great weight of the testimony, in this, that the entire evidence shows a knowledge of and participation in the restraint by appellee exercised upon Dimmitt, which rendered void any contract or obligation such as is contended for in this case entered into by Dimmitt with appellee.

The evidence is wholly inconsistent with any other conclusion, and we are of opinion that because the evidence does not support the judgment the cause should be reversed and remanded.

*Reversed and remanded.*

Adopted June 25, 1889.

Presiding Judge Acker not sitting in this case.