**FIRST GUARANTY STATE BANK OF CLYDE v. TIPTON. (No. 1179.)**

(Court of Civil Appeals of Texas. El Paso. Feb. 3, 1921. Rehearing Denied March 3, 1921.)

1. Deeds ⚭71—Threat to prosecute relative is duress avoiding deed.

Duress sufficient to warrant the cancellation of a deed may be practiced upon a person by threats of criminal prosecution against a near relation if the anxiety and fear of disgrace excited by such threats are so potent as to overcome the free will and choice of the person affected.

2. Deeds ⚭71—Duress avoiding deed may be practiced by representations another would prosecute sons.

A bank cashier who represented to a mother that the bank would refuse to honor checks drawn by her sons unless she conveyed her property to the bank, and that as a result of refusal to honor the checks the sons would be arrested and thrown into jail, practiced such duress as to warrant cancellation of the conveyance; it being unnecessary that the threatened prosecution is to be by the person practicing the duress.

Appeal from District Court, Taylor County; W. R. Ely, Judge.

Suit by Mrs. Fannie Tipton against the First Guaranty State Bank of Clyde. Judgment for plaintiff, and defendant appeals. Affirmed.

Dallas Scarborough, of Abilene, for appellant.

W. P. Mahaffey, of Merkel, and Ben L. Cox, of Abilene, for appellee.

HARPER, C. J. This suit was brought to cancel a deed to certain lots in the town of Merkel, Tex., executed by Mrs. Fannie Tipton, plaintiff, to First State Bank of Clyde, Tex., defendant. For cause of action she alleged that no consideration passed for its execution, that she signed and acknowledged it under duress, in this, that "she was fraudulently imposed upon and placed under du-

---

⚭For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ress and fear of having her sons arrested and under these circumstances signed and executed said deed of conveyance."

Defendant answered by general demurrer, general denial, and specially:

"That it extended a line of credit to two of plaintiff's sons in consideration of a chattel mortgage on certain mules; that thereafter and before the money had been used defendant learned that the stock had a prior lien upon it, and that thereupon it refused to pay any more checks; that thereupon plaintiff executed the deed in question in consideration that defendant pay the note secured by the first lien on the mules, and certain checks which had in the meantime been issued by her two sons to parties from whom they had purchased live stock; that it paid out $1,368.90 for said deed."

—prayed that, if it be denied title and possession of the land, then that it be decreed a lien upon it for said sum.

The cause was submitted to a jury upon special issues, and upon the verdict of the jury judgment was entered for plaintiff, from which an appeal has been perfected.

The jury found that the plaintiff was induced to sign the deed by duress, and that it was intended as a mortgage.

The two first assignments urge that the evidence is insufficient to raise the issue of duress.

[1] "Duress may be practiced upon a person by threats of a criminal prosecution against the husband or wife of such person, or against a near relation such as a parent or child, and if the dread, anxiety, and fear of disgrace excited by such threats are so potent as to overcome the free will and choice of the person affected, such duress may be pleaded to invalidate any contract, conveyance, or security extorted from him by means of it." Black on Rescission and Cancellation, § 235; Medearis v. Granberry, 84 S. W. 1070; Dimmett v. Robbins, 74 Tex. 441, 12 S. W. 94; Cook v. Moore, 39 Tex. 255; Olivari v. Menger, 39 Tex. 76.

[2] Appellant's proposition is that "threats that some one else will prosecute her sons is not sufficient to constitute duress," and "that the threats must be made by the party who obtains the benefit."

The evidence reveals that the appellee, Mrs. Tipton, an aged woman, the mother of two boys, was the owner of the property in controversy; that these boys, after having been given a line of credit by the appellant bank through its cashier, purchased cattle and hogs for shipment to market.

Some time after they had been buying and shipping, the cashier of the bank was informed that certain checks had been given in excess of the amount of money that the boys had to their credit. It had also been discovered that certain mules upon which the boys had executed a mortgage in favor of appellant had been previously mortgaged to

the bank at Merkel. Appellant's cashier testified:

"I told Mrs. Beulah Tipton that I was going to refuse to pay the checks, and that I thought they would give the boys trouble; in other words, it was a violation of law to give a check without the money in the bank. My bank did not threaten her in any way. I went down to see Mrs. Tipton to get her to make me a deed to the property and she refused. I called Mrs. Beulah Tipton to get her to fix the instrument up some way. I told her that the boys would likely be brought back and put in jail and that they would likely be unable to give bond."

Mrs. Beulah Tipton testified:

"In 1917 my husband, Frank Tipton, and Bill Tipton, my brother-in-law, were engaged in buying some cattle, hogs, and live stock. They were doing business with the First Guaranty State Bank of Clyde, Tex. Relative to Mr. Homer Shanks calling me over the telephone and me having a conversation with him during 1917, he called me over the phone, it was either Wednesday or Thursday afternoon, I do not know which, and asked me where the boys was, and I told him they were in Wichita Falls. By 'the boys' I supposed he meant my husband and Bill. He then asked me would I come to town, he wanted to see me on some very important business, and I told him I would, and I dressed and went to town, and when I went up there he taken me off and talked to me and told me that the boys had given some checks at Cross Plains, and that they did not have money there to cash the checks when they came in, and if something was not done and done at once they would arrest the boys and bring them back there and lodge them in jail, and I told him that I would write the boys about it, because I was not informed on matters; that I would write the boys and let them come home and see about it. He said I did not have time for anything like that, that it had to be attended to at once, and that I had better let them stay there and work than to have them brought back and put in jail, as they could not give bond and better let them stay at work there, as it would contribute to our support; and he also asked me if my mother-in-law and myself were on good terms, and I told him we were, and he told me the only thing we could do was for her to let that place at Merkel stand good for those checks at Cross Plains; that he would cash those checks at Cross Plains and turn the checks over to me as they came in. I do not suppose they ever come. I have never gotten one of them back. I went and told Mrs. Tipton what he said, and she studied over it and worried over it. We had no one to advise us at all. There were none of the men folks at home, and he kept telling me that they would arrest the boys and bring them back if that was not fixed up on Saturday. Saturday was the last day it was to be fixed, and I told Mrs. Tipton, and so she said just for the sake of the boys she would sign the paper. He told me that it was a vendor's lien note. I did not know what it was because I did not read it, and I would not have known if it were a vendor's lien note if I had read it. In place of bringing it down to the

house himself for her to sign, he came to the show Saturday afternoon and sent Mr. Robbins, Mr. Robbins came down there and brought it, and he told Mrs. Tipton, he said it was a vendor's lien note she was signing. She read a part, but did not read it all, and she told us how it was signed, signing the homestead away, and that she was willing only to give it to keep the boys out of jail; told him that she was doing it just for the love of her boys. At that time I was staying with Mrs. Tipton. I suppose he was up there every other day until we got it fixed up. When I talked to him about the matter, and he told me that they were going to have the boys arrested and brought back, I went back and told Mrs. Tipton what he said. She did not want to sign it, but she did in order to keep the boys out of trouble."

Plaintiff testified:

"My daughter-in-law told me what Mr. Shanks said. She said that he said if I did not put the place up and let it stand for these they would go ahead and arrest the boys and bring them back and put them in jail; that they could not give bond and the jig would be up; that Saturday would be the last day. I believed that the bank was going to have them arrested if I did not do that. I signed the deed to keep my boys from going to jail and to get the checks paid. It was about two or three weeks before my daughter told me what Mr. Shanks said that he was down to see me. At that time he wanted my little place to stand for the boys, for the money he was advancing to them to buy live stock. I told him that I would not let him have that home place, that was all I had, and that I was getting old and not able to work, and he kept on insisting, and I told him no use talking that I would not let him have it, and he picked up his hat and walked out, and said, 'I want you to keep your old place,' and I says, 'I intend to keep it;' that it was the only property I had. No one has paid me a dollar for the place or anything else."

True, the testimony of the cashier and the daughter exclude the idea that the bank would institute the prosecutions, but we think this makes no difference under the facts of this case. The appellee was made to believe that her sons would be arrested and jailed, etc., and that this was the sole reason for executing the deed, and the jury have so found. This constitutes such duress as to require a court of equity to cancel the deed. Ball v. Ball, 37 L. R. A. (N. S.) 539, note.

The bank's agent by his importunities, which amounted to actual threats, has coerced the appellee into the frame of mind which caused her to execute the deed without consideration, and upon which we conclude was a false and fraudulent premise. It had given the line of credit, and was obligated to pay the checks under the facts in this record, and therefore there had not been in fact any violation of law, and they were not subject to lawful arrest.

True, the cashier says the bank had not extended an unlimited line of credit, but he failed to state the extent of it, nor does he say that the extent of the line of credit did not cover the amount of the checks.

The test seems to be:

"If the contracting party has been so impressed with a sense of imminent danger and so put in fear as to be deprived of the free will power essential to contractual capacity, the resulting deed may be avoided for duress."

We are of the opinion that evidence is sufficient to support the verdict and judgment.

The other assignment is not contained in the motion for new trial; therefore will not be considered.

Affirmed.