**DALLAS COUNTY COMMUNITY COLLEGE DISTRICT, et al., Petitioners,**

v.

**William H. BOLTON II, et al., Respondents.**

No. 02–1110.

Supreme Court of Texas.

Argued Jan. 7, 2004.

Decided Dec. 2, 2005.

Rehearing Denied Feb. 24, 2006.

Sydney W. Falk, Jr., Bickerstaff Heath Smiley Pollan Kever & McDaniel, L.L.P., Austin, amicus curiae for Texas Association of Community.

P. Michael Jung, Christine Roseveare, Strasburger & Price, L.L.P., W. Neil Ram-

bin, Sedgwick Detert Moran & Arnold, Dallas, Bruce A. Griggs, Ogletree Deakins Nash Smoak & Stewart, P.C., Austin, for Petitioners.

Carla S. Hatcher, Thorpe, Hatcher & Washington, L.L.P., Marc R. Stanley, Martin Darren Woodward, Stanley Mandel & Iola, L.L.P., Dallas, for Respondents.

Justice WAINWRIGHT delivered the opinion of the Court, in which Justice HECHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, and Justice WILLETT joined.

William H. Bolton II and other students sued the Dallas County Community College District over the imposition of fees charged by the District to fund technology purchases and to support student services, claiming that the fees were illegally imposed. The trial court certified a class of students who paid these fees. After a jury trial, the trial court entered a judgment awarding the Class approximately $15 million. The court of appeals applied a shorter two-year statute of limitations, limited the award of prejudgment interest, and accordingly ordered a reduction in the total amount of the recovery. It affirmed the remainder of the judgment. We hold that the Texas Education Code authorized the District to impose the technology fee. We further conclude that the Class cannot seek repayment of the student services fee because the District established as a matter of law that the fee was a voluntary payment and the undisputed evidence did not establish that the fee was paid under duress to rebut the voluntary payment rule. We therefore reverse the court of appeals' judgment.

## I. Factual and Procedural History

The Dallas County Community College District is a junior college district comprised of seven separate colleges which are Brookhaven, Cedar Valley, Eastfield, El Centro, Mountain View, North Lake, and Richland. Each of them operates independently under a president who reports to the Chancellor of the District. An elected seven-member Board of Trustees administers the District.

During the time period at issue in this case, the District charged a technology fee, intended to support the purchase of technology-related items for student use, and a student services fee, intended to fund extracurricular activities. In 1996, the technology fee was changed from a fixed fee of $10 per semester for all students to an amount set on a sliding scale of $2 per semester credit hour, with a minimum fee of $10 and a maximum fee of $40 for each student per semester. A member of the student government at the Richland campus had previously proposed that the student services flat fee be increased. After consideration, the District in 1997 changed the student services fee from a flat fee of $10 per semester to a sliding scale that matched the technology fee—$2 per semester credit hour, with a minimum fee of $10 and a maximum fee of $40 per student.

On April 13, 1998, William H. Bolton II, Helen Bolton, Bruce Albright, Jason Grimes, and Daniel Martinez sued the Dallas County Community College District and its board of trustees, alleging that the fees were unlawfully imposed and seeking declaratory relief, damages, and attorney's fees arising from the collection of these student fees. The trial court certified a class of students who paid either the technology fee or the increased student services fee during the fall of 1997 or after, based on six or more credit hours taken.

After both the Class and the District moved for partial summary judgment, the trial court held that the technology fee charged by the District was not authorized by law. The trial court also ruled that the

District was required by section 54.503(f) of the Texas Education Code to obtain student approval for the increase in the student services fee and held that the Class had established as a matter of law that the student governments at Brookhaven, Cedar Valley, El Centro, and North Lake had not approved the increase in the student services fee.[1] The Class stipulated that the Eastfield campus had approved the increase in the student services fee, and the trial court submitted to the jury the question of whether student governments at Richland and Mountain View had approved the fee. The jury found these campuses had not approved the fee. The trial court further held that, as a matter of law, the class members at these schools paid the student services fee under duress.

In its final judgment, the trial court awarded the Class $13,575,487 for recovery of the technology fee and $1,469,262 for the increased student services fee. It further awarded $271,532 in attorney's fees and expenses to the Class. The trial court excluded the Eastfield campus from the student services fee award because the parties had stipulated that the Eastfield student government approved a student services fee increase, therefore complying, in the trial court's opinion, with the statutory requirement.

The court of appeals affirmed the trial court's judgment with two exceptions. 89 S.W.3d 707, 724. First, it held that a two-year, rather than a four-year, statute of limitations governed the claim for recovery of illegal fees paid under duress. *Id.* at 721–22. Second, it held that the Class could not recover prejudgment interest accrued before April 13, 1998. *Id.* at 722–24. The court of appeals therefore reversed

the trial court's judgment in part, affirmed it in part, remanded the case to the trial court for recomputation of damages based on the shorter statute of limitations, and reformed the trial court's judgment regarding prejudgment interest. *Id.* at 724. The District sought review in this Court.

## II. Standard of Review

■ The parties here filed cross-motions for summary judgment. Defendants filed a motion for partial summary judgment under Rules 166a(c) and 166a(i) seeking a determination that the Class's claims were barred by the defense of the voluntary payment rule as a matter of law and asserting that there was no evidence of duress. The Class responded that they were entitled to summary judgment defeating the District's defense as a matter of law because they paid the technology fees under duress, which rebuts a voluntary payment defense. The District had the burden of conclusively establishing its defense of voluntary payment. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). It introduced evidence that all of the named plaintiffs paid the fees without filing any type of grievance or protest. The District's motion asserted that there was no evidence of duress. *See* TEX. R. CIV. P. 166a(i) ("[A] party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial."). However, the Class representatives submitted no evidence of duress but instead argued that duress was established as a matter of law by the District's imposition of mandatory student fees.

---

1. Although applicable sections of the Texas Education Code have been amended since the commencement of this case, we refer to the 1996 version of the Code rather than the amended version unless otherwise noted.

■ The Class sought summary judgment under Rule 166a(c) on the grounds that it suffered duress as a matter of law and that sovereign immunity did not bar its claims against the District. The Class had the burden to establish that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c).

## III. Junior College Fee–Setting Authority

The Legislature authorizes localities to create public junior college districts and support them primarily with local funds. TEX. EDUC. CODE § 130.014 ("If the coordinating board approves of the establishment of the junior college district, it shall then be the duty of the local school board to enter an order for an election to be held ... to determine whether or not such junior college district shall be created and formed ...."); *id.* § 130.003(a) (stating that junior colleges receive state appropriations only in "an amount sufficient to supplement local funds"). The governing boards, also known as the boards of trustees, of the districts retain locally all authority over public junior college districts that is not otherwise vested by statute in the Texas Higher Education Coordinating Board or in some other body. *Id.* § 61.060 ("All authority not vested by this chapter or other laws of the state in the [Texas Higher Education Coordinating Board] is reserved and retained locally in each respective public junior college district ...."). The Legislature generally retains the right by statute to regulate specific actions and set fees of the districts; however, absent legislation exercising such authority or delegating specific power to the Board or the Texas Education Agency, the boards of trustees of public junior colleges exercise plenary authority over their operation. *See generally* TEX. EDUC. CODE §§ 60.060, 130.002, 130.003.

When the Texas Education Code was codified in 1969, chapter 130 was designated for regulation of public junior colleges and chapter 54 was designated for regulation of tuition and fees of other institutions of higher education, with some exceptions. "Institution of higher education" includes public state colleges, public junior colleges, public senior colleges or universities, public technical institutes, and medical and dental schools. *Id.* § 61.003(8). Although public junior colleges are included in the definition of "institution of higher education," they are not included among the institutions directly regulated by chapter 54. Chapter 54, concerning regulation of tuition and fees, only applies to junior colleges "to the extent provided by section 130.003(b) of this code." *Id.* § 54.002. In this statutory scheme for regulation of public universities and public junior colleges, the Class and the District assert different answers to the question of whether the District needed specific statutory authorization to charge a technology fee and to increase student services fees.

## A. Technology Fee

The court of appeals held that the District lacked the statutory authority to charge a technology fee unless that fee were pledged to the repayment of revenue bonds. 89 S.W.3d at 714–17. Determining the legality of the fee requires us to analyze a number of provisions in the Texas Education Code.

■ Statutory construction is a matter of law, which we review de novo. *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent. *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003) (citing *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318

(Tex.2002)). We must interpret a statute according to its terms, giving meaning to the language consistent with other provisions in the statute. *See McIntyre*, 109 S.W.3d at 745.

■ The parties agree that section 130.123 of the Education Code explicitly grants junior colleges the authority to charge fees for the purchase and use of technological equipment. This section provides that each junior college board "shall be authorized to fix and collect ... fees from students and others for the occupancy, use, and/or availability of all or any of its property, buildings, structures, activities, operations, or facilities, of any nature, in such amounts and in such manner as may be determined by such board." Tex. Educ. Code § 130.123(c). The court of appeals held, however, that this section only authorizes the District to collect technology fees if those fees are pledged to revenue bonds. The court of appeals reached this conclusion because another section of the statute authorizes the Board to pledge revenue from the fees to payment of bonds. 89 S.W.3d at 717. Section 130.123(d) provides that "[e]ach board shall be authorized to pledge all or any part of any of its revenues from any of the aforesaid ... fees to the payment of any bonds issued hereunder, including the payment of principal, interest, and any other amounts required or permitted in connection with said bonds." Tex. Educ. Code § 130.123(d). Although section 130.123(c) authorizes public junior colleges to charge technology fees, it contains no requirement that the fees be pledged to revenue bonds. For several reasons, we hold that public junior college districts have the statutory authority to charge technology fees at their campuses without being required by statute to pledge the revenue, or any portion of it, to repay bonds.[2]

■ Although section 130.123(c) specifically authorizes junior colleges to set technology fees and in the language of this section allows junior colleges to pledge the fees to the payment of revenue bonds, it does not restrict the District from charging additional technology fees that are not pledged to revenue bonds. *Id.* § 130.123(c). The statute merely permits the fees to be pledged, providing that the "[f]ees ... *may* be pledged to the payment of said bonds," and authorizes the board of trustees to pledge "all or any part of any of its revenues from any of the aforesaid ... fees to the payment of any bonds issued hereunder," but it does not require that districts pledge the fees to repay revenue bonds. *Id.* § 130.123(d) (emphasis added).[3] We cannot disregard the Legislature's choice of language in providing that the authorized fees "*may* be pledged to the payment" of revenue bonds rather than requiring that they *must* or *shall* be so pledged. *Id.* (emphasis added). According to the Code Construction Act, " '[m]ay' creates discretionary authority or grants permission or a power," whereas " '[s]hall' imposes a duty" and " '[m]ust' creates or recognizes a condition precedent." Tex. Gov't Code § 311.016. Legislative authorization to act ordinarily grants the power to do so but by itself does not require execution of the power granted. *See In re Fulgium*, 150 S.W.3d 252, 255

---

2. This conclusion is not intended to undermine or change any existing contractual arrangements to service bond debt from public junior college fees.

3. Our holding does not interfere with bonds in which the parties committed such fees to service the bond debt. Here the Class does not argue that the fees have been so committed, and the parties cite no provisions in the contracts or other bond documentation committing the fees for that purpose.

(Tex.App.-Texarkana 2004, orig. proceeding) ("Under the Code Construction Act, the word 'may' creates discretionary authority.").

The Class argues that "the word 'may' should be construed to mean 'shall' when other language in a statute shows that the Legislature so intended." *See Nat'l Sur. Corp. v. Ladd*, 131 Tex. 295, 115 S.W.2d 600, 602 (1938). The Class asserts that is the case here and points out that the entirety of section 130.123 is entitled "Revenue Bonds," indicating a necessary tie between technology fee revenue and servicing revenue bonds. The Class also points out that the Legislature acknowledged this possibility in the Code Construction Act. TEX. GOV'T CODE § 311.016 (providing an exception to the rule construing "may" and "shall" when "the context in which the word or phrase appears necessarily requires a different construction"). This argument, which could prove persuasive in some circumstances, fails here for two reasons. The Legislature itself answered this argument with guidance in the Code Construction Act on interpreting its statutes. The Legislature advised that "[t]he heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute." *Id.* § 311.024. The language of the statutory provision does not support the interpretation sought by the Class. The words "may" and "shall" mean different things, and there is no clear indication from the Legislature that it intended otherwise. Additionally, even though the title of the section is "Revenue Bonds," this does not control the content of the statute or dictate our interpretation of it. The context in this case does not require an interpretation of the permissive word "may" to mean something other than its plain meaning.

The Legislature could certainly have provided districts with the discretion to fund their facilities and activities on a pay-as-you-go basis instead of requiring them to incur debt in the form of revenue bonds, particularly since bond indebtedness affects the credit rating of governmental entities. *See, e.g., id.* § 1231.023(c)(1) (requiring the Bond Review Board to "provide a mechanism for evaluating the amount of state debt that can be managed prudently"). The Legislature therefore provided public junior colleges with the choice of utilizing fees to pay for technology and related services on a current basis or issuing revenue bonds to finance the facilities and activities through fee revenue. The Legislature could easily have mandated that the fee revenue be tied to revenue bonds, but it did not.

Accordingly, we decline to imply a legislative intent that is not reflected in the language of the statute and would be at odds with the broad legislative grant of plenary authority to local public junior college boards.

The court of appeals held that the statutory provision requiring the attorney general to approve the issuance of the bonds also required the attorney general to "review and assess the validity" of the fees,[4] concluding that the Legislature could not have intended to provide junior colleges with the authority to "impose any fee [it wanted] for the use of its facilities." 89 S.W.3d at 716.

■ We conclude that the Legislature intended to provide public junior college

---

4. The statute further provides that before bonds can be issued, the bonds must be submitted to the attorney general for a determination that such bonds have been authorized in accordance with the law. TEX. EDUC. CODE § 130.123(g). We note that the language of the statute only requires the Attorney General to approve the bonds, not the fees. *Id.*

districts with discretion to set both tuition and fees at appropriate levels as long as the districts comply with certain statutory requirements. At the time this case arose, for example, the Education Code permitted junior college districts to exercise discretion in setting tuition rates as long as the districts met certain statutory minimums. Section 54.051(n) provides that "[t]uition for a resident student registered in a public junior college is determined by the governing board of each institution, but the tuition *may not be less* than $8 for each semester credit hour and *may not total less* than $25 for a semester." TEX. EDUC. CODE § 54.051(n) (emphasis added). The statute set a ceiling for tuition at four-year universities, but specifically stated that "[t]he limit on tuition rates ... does not apply to tuition at a public junior college."[5] *Id.* § 54.008(c). The Class does not dispute that the District could have therefore required students to pay the same dollar amount if it labeled the required payments as "tuition" rather than "fees."

■ Finally, even if section 130.123(c) did not specifically authorize the District to set the amount of the technology fee, the District reserves and retains the authority to do so, absent allocation by the Legislature of this authority to some other body, or specific determination of the fee or limits on the fee amount by statute. *See id.* § 61.060. The Class has not identified, and we have not found, any statutory allocation of this authority to another entity or any legislation setting the fee. Therefore the District retained the power to do so.

The Legislature has in another instance permitted junior college districts to exercise greater control over both tuition and fees than four-year universities may exercise. As noted above, it placed no ceiling on the amount of tuition that could be charged by junior colleges, even though it limited the tuition that could be charged by four-year colleges. TEX. EDUC. CODE § 54.051(n). The Legislature may have granted additional discretion because it intended that junior colleges be primarily funded by local, rather than state, funding. *See id.* § 130.003(a) (providing that junior colleges receive state appropriations only in "an amount sufficient to supplement local funds").

In addition to having different primary funding mechanisms, public junior colleges and four-year universities are also accountable to the public in different ways. While the governing boards of state universities are composed of gubernatorial appointees, junior college districts are governed by elected trustees. *See, e.g.,* TEX. EDUC. CODE §§ 65.11, 85.11, 135.22; *see also id.* § 130.082. The governing boards of public junior colleges are accountable to the local voters in these districts—the very electorate that voted to create the junior colleges and tax itself to support them. *See id.* § 130.014 (authorizing an election "to determine whether or not such junior college district shall be created and formed and to submit the questions of issuing bonds and levying bond taxes, and levying maintenance taxes, in the event the district is created"). Thus, it appears that through this statutory scheme, the Legislature desired to directly regulate tuition and fees at the public universities while permitting

---

**5.** In 2003, the Legislature gave other institutions of higher education—including four-year universities—additional discretion over tuition rates. TEX. EDUC. CODE § 54.0513 (permitting the governing board of an institution of higher education to charge, in addition to the tuition rates specifically authorized by chapter 54, an additional amount "designated as tuition that the governing board considers necessary for the effective operation of the institution").

public junior college district trustees more autonomy in setting fees, with oversight provided by local voters.

We conclude that section 130.123 provides junior college districts with the authority to impose technology fees and to set the amount of such fees. *See* Tex. Educ. Code § 130.123. Because the plain language of section 130.123(c) authorizes the junior colleges to "fix and collect" such fees, we hold that the District was authorized to charge the technology fee regardless of whether the fee was pledged to support revenue bonds.

### B. Student Services Fee

■ Section 54.503 of the Education Code authorizes public institutions of higher education to charge fees to fund student activities.[6] It provides, however, that the amount of such fees may not be increased more than ten percent in one year "unless the increase is approved by a majority vote of students voting in an election held for that purpose or by a majority vote of the student government at the institution." Tex. Educ. Code § 54.503(f). The Class contends that section 54.503(f) governs this case and that the District failed to rebut its summary judgment proof that several of the public junior college campuses did not approve the fee increase as required.

The district contends that the fee increase was approved but even if the fee were charged in violation of section 54.503, the trial court erred in awarding the Class almost $1.5 million in damages. It notes that the Class paid the fees without ever

protesting their validity, and it asserts that the fees were non-recoverable voluntary payments to the government. The Class responds that the trial court properly held that the fees were recoverable because they were paid under duress, as a matter of law, and were therefore not non-recoverable voluntary payments to the government.

Our precedents on duress and voluntary payments to government entities extend into the nineteenth century. In paying taxes and government fees, we have long recognized that, under the common law, duress may play a pivotal role in the pay-or's ability to recover those payments when the taxes and fees are later determined to be unlawful. A person who pays a tax voluntarily and without duress does not have a valid claim for its repayment even if the tax is later held to be unlawful. *Nat'l Biscuit Co. (Nabisco) v. State,* 134 Tex.293, 135 S.W.2d 687, 692–93 (1940); *Austin Nat'l Bank v. Sheppard,* 123 Tex. 272, 71 S.W.2d 242, 245–46 (1934). In 1890, we held that it was "well settled" that "a tax voluntarily paid cannot be recovered, though it had not the semblance of legality." *City of Houston v. Feizer,* 76 Tex. 365, 13 S.W. 266, 267 (1890). This voluntary payment rule may seem counter-intuitive, but there are important reasons supporting it. In the taxation context, the rule secures taxing authorities in the orderly conduct of their financial affairs. *Id.,* 13 S.W. at 267 ("It is a rule of quiet as well as of good faith . . . ."); *see also Salvaggio v. Houston Indep. Sch. Dist.,* 752 S.W.2d

---

**6.** We do not address the questions of whether section 54.503(f) applies to junior colleges, given that section 54.002 generally excludes them from the application of chapter 54, or whether sections 130.123(c) or 61.060 independently authorize the increases in student services fees. *See* Tex. Educ. Code §§ 61.060, 130.123(c). As the Class points out, the District did not preserve this issue in the trial court. *See San Jacinto River Auth. v. Duke,* 783 S.W.2d 209, 210 (Tex.1990). In the trial court, the District contended only that it had properly obtained student approval, not that it was exempt from the approval requirement altogether. Therefore, the District neither raised this issue nor obtained a ruling on it. *See* Tex. R. App. P. 33.1(a); *In re B.L.D.,* 113 S.W.3d 340, 345 (Tex.2003).

189, 193 (Tex.App.-Houston [14th Dist.] 1988, writ denied). The Supreme Court also has recognized the "government's exceedingly strong interest in financial stability in this context" and threats to a state's financial security that can arise from unpredictable revenue shortfalls. *McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco, Dep't of Bus. Regulation of Fla.,* 496 U.S. 18, 37, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). The rule also supports the age-old policies of discouraging litigation with the government. *See Austin Nat'l Bank,* 71 S.W.2d at 246; *see also Salvaggio,* 752 S.W.2d at 193.

On the other hand, a person who pays government fees and taxes under duress has a valid claim for their repayment. *Union Cent. Life Ins. v. Mann,* 138 Tex. 242, 158 S.W.2d 477, 479 (1941); *Nabisco,* 135 S.W.2d at 692–93; *Austin Nat'l Bank,* 71 S.W.2d at 246. Reimbursement of illegal fees and taxes is allowed, in essence, when the public entity compels compliance with a void law and subjects the person to punishment if he refuses or fails to comply. *State v. Akin Prods. Co.,* 155 Tex. 348, 286 S.W.2d 110, 111–12 (1956); *see also In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 758 (Tex.2001). We have applied these rules to the imposition of illegal fees as well as illegal taxes, holding that a party may seek reimbursement of illegal license fees paid under duress. *Akin Prods. Co.,* 286 S.W.2d at 111–12; *Crow v. City of Corpus Christi,* 146 Tex. 558, 209 S.W.2d 922, 925 (1948).

### i. Common Law Historical Development

In considering duress, it is useful to review its historical context. The early common law restricted duress to "imprisonment or threats sufficient to put a brave man in fear of loss of life or limb or of imprisonment of himself or a member of

his immediate family." RESTATEMENT (SECOND) OF TORTS § 892B cmt. j (1977). We characterized duress as the result of threats which render persons incapable of exercising their free agency and which destroy the power to withhold consent. *Dimmitt v. Robbins,* 74 Tex. 441, 12 S.W. 94, 96–97 (1889). The common law concept of duress was later enlarged. *Akin Prods. Co.,* 286 S.W.2d at 111 ("The early common-law doctrine of duress has been expanded and many courts have adopted the modern doctrine of 'business compulsion' . . . ."); *see also Ward v. Scarborough,* 236 S.W. 434, 437 (Tex.Com.App. 1922). The Restatement of Restitution defined duress less restrictively as a "serious risk of imprisonment or of the loss of possession of his things or of other substantial loss" and "a reasonable anticipation by the payor of substantial risk of loss or serious inconvenience if the payment is not made." RESTATEMENT (FIRST) OF RESTITUTION § 75(1)(b) cmt. f (1937). Many courts have recognized an additional, "modern" type of duress often referred to as "business compulsion" or "economic duress." *Akin Prods. Co.,* 286 S.W.2d at 111; *Crow,* 209 S.W.2d at 924; PROSSER AND KEETON ON TORTS § 18, at 121 (5th ed.1984). We have referred to business compulsion and economic duress as "implied duress," because the pressure to pay these government exactions is indirect and flows from statutes or ordinances. *See Miga v. Jensen,* 96 S.W.3d 207, 211, 224–25 (Tex.2002) (compulsion "implied by the threat of statutory penalties and accruing interest" constitutes economic duress); *Powell,* 640 S.W.2d at 237 (holding that duress may be implied from a statute which imposes a penalty and interest for failure to timely pay a tax); *Austin Nat'l Bank,* 71 S.W.2d at 246; *Nabisco,* 135 S.W.2d at 692–93.

We have also held that business compulsion [7] may constitute duress and allow recovery of the payment of an illegal tax or fee. In *Crow* we held that a city ordinance compelling a choice between paying an illegal license fee to operate a cab or cab company and forfeiting one's livelihood or right to do business constitutes business compulsion, or implied duress, as a matter of law. 209 S.W.2d at 924–25. We also determined that if, due to imposition of taxes on packaged citrus fruit, "a reasonably prudent man finds that in order to preserve his property or protect his business interest it is necessary to make a payment of money which he does not owe," the taxes were paid under duress. *Akin Prods. Co.*, 286 S.W.2d at 111. Failure to pay the mandatory citrus tax would have resulted in the businessman suffering a daily penalty and interest. *Id.* In another circumstance, the National Biscuit Company ("Nabisco") paid franchise and permit fees for several years rather than pay a penalty of twenty-five percent of the fees and forfeit its right to do business in Texas. *Nabisco*, 134 Tex. 293, 135 S.W.2d 687. After the fees were declared unconstitutional, Nabisco sued to recover them. We held that, where a statute imposed the penalties at issue, the taxes were paid under duress and the taxpayer need not take the risk of incurring the statutory punishments while the case was being litigated. *Id.* at 693. Finally, we held that Highland Church of Christ's payment of a judgment for ad valorem taxes on an office building it owned was involuntary. *Highland Church of Christ v. Powell*, 640 S.W.2d 235 (Tex.1982). The Church paid the judgment to "avoid penalties and interest which would accrue while the case was on appeal," and this Court held that the judgment was therefore "not voluntarily paid." *Id.* at 237.

This Court has consistently recognized business compulsion arising from payment of government fees and taxes coerced by financial penalties, loss of livelihood, or substantial damage to a business. *See Metro. Life Ins. Co. of N.Y. v. Mann*, 140 Tex. 450, 168 S.W.2d 212 (1943) (threatened revocation of certificate of authority to transact insurance business for failure to pay void occupation taxes); *Union Cent. Life Ins. v. Mann*, 138 Tex. 242, 158 S.W.2d 477 (1941) (threatened revocation of certificate of authority to transact insurance business for failure to pay void taxes on annuity premiums); *Austin Nat'l Bank of Austin v. Sheppard*, 123 Tex. 272, 71 S.W.2d 242 (1934) (holding that duress was established when a company showed that the Secretary of State's refusal to file an amended charter of asphalt company jeopardized its ability to do business unless a second filing fee was paid).

A common element of duress in all its forms (whether called duress, implied duress, business compulsion, economic duress or duress of property) is improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and

---

**7.** Although courts have described business compulsion as a type of implied duress when addressing a party's right to restitution of an illegal tax, they have distinguished this type of compulsion by governmental authorities from the more elevated level of duress or coercion generally applied in private transactions. *See Austin Nat'l Bank*, 71 S.W.2d at 246 (classifying business compulsion as implied duress); *Robertson v. Frank Bros. Co.*, 132 U.S. 17, 23, 10 S.Ct. 5, 33 L.Ed. 236 (1889) ("When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required,—as where an officer exacts illegal fees, or a common carrier excessive charges."); *see also* RESTATEMENT (SECOND) OF CONTRACTS, §§ 174, 175 (1981) (describing the more elevated forms of duress often applied in private transactions, including "duress by physical compulsion" and "duress by threat").

does interfere with another person's exercise of free will and judgment. *See In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 574 (Tex.1999) (defining duress as "a threat to do some act which the threatening party has no legal right to do"); *Ward v. Scarborough,* 236 S.W. 434, 437 (Tex. Com.App.1922) ("The restraint, intimidation, or compulsion is sufficient if it induces ... some act ... contrary to his will."); RESTATEMENT (SECOND) OF TORTS §§ 892B cmt. j, 871 cmt. f(1979); *Crow,* 209 S.W.2d at 925.

The compulsion must be actual and imminent, and not merely feigned or imagined. *See Ward,* 236 S.W. at 437; *Dimmitt,* 12 S.W. at 96–97. We have repeatedly held that duress is established where the unauthorized tax or fee is "required," "necessary," or "shall" be paid to avoid the government's ability to charge penalties or halt a person from earning a livelihood or operating a business. *Crow,* 209 S.W.2d at 924; *Metro. Life Ins. Co.,* 168 S.W.2d at 215; *Union Cent. Life Ins.,* 158 S.W.2d at 481; *Nabisco,* 135 S.W.2d at 692–93; *Austin Nat'l Bank,* 71 S.W.2d at 246. Succinctly, the decision faced "is to comply or close up." *Akin Prods. Co.,* 286 S.W.2d at 111; *Ward,* 236 S.W. at 437 ("The restraint must be imminent and such as to destroy free agency without present means of protection.").

### ii. Statutory Development

In many areas, the common-law requirements for voluntary payments and duress have been supplanted by statute. In the years after *Nabisco* and *Austin Nat'l Bank,* the Legislature systematically adopted refund mechanisms and protest requirements in various statutes that obviated the need to show business compulsion in many cases. *See, e.g.,* TEX. GOV'T CODE § 403.202; TEX. TAX CODE §§ 31.115,

112.051; *see also State Life Ins. Co. v. Daniel,* 6 F.Supp. 1015, 1017 (W.D.Tex. 1934) (noting that the Texas Legislature enacted the first protest statute after "taking notice of the fact that taxpayers were being required by officers of the state to make payments which they believed to be unlawful," and that the Legislature "desired to effect an arrangement by which payments could be made without waiver" of the right to seek a refund).

For example, the Legislature adopted mechanisms for the refund of a "tax or fee imposed by [Title 2 of the Tax Code] or collected by the comptroller under any law, including a local tax collected by the comptroller." TEX. TAX CODE § 112.051. The Legislature adopted a similar refund mechanism for the recovery of allegedly illegal "occupation, excise, gross receipts, franchise, license, or privilege tax[es] or fee[s]" paid "to any department of the state government." TEX. GOV'T CODE § 403.202. The Legislature also enacted a mechanism to protest the payment of ad valorem taxes in order to recover an overpayment. TEX. TAX CODE § 31.115.

These statutes apply to most of the taxes and fees expressly authorized by statute. They apply to state and local sales taxes, property taxes, corporate franchise taxes, professional occupation taxes, and much more. *See, e.g.,* TEX. GOV'T CODE § 403.202; TEX. TAX CODE §§ 31.115, 112.051. Fees paid to state universities also fall under the protest statute, as do property taxes paid to community college districts. TEX. GOV'T CODE § 403.202; TEX. TAX CODE § 31.115; *see also Rainey v. Malone,* 141 S.W.2d 713, 714 (Tex.Civ. App.-Austin 1940, no writ) (holding that, in order to contest the legality of the student union fee at the University of Texas, a student was required to "pay it under protest, and bring suit for its recovery"). However, none of these statutes applies

directly to fees charged by public junior colleges.

### iii. Voluntariness of the Student Services Fee

Where the facts are undisputed, determination of whether a payment is voluntary or involuntary is a question of law. *See Windham v. Alexander, Weston & Poehner, P.C.*, 887 S.W.2d 182, 185 (Tex. App.-Texarkana 1994, writ denied); *Matthews v. Matthews*, 725 S.W.2d 275, 278 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.); *accord Merrill v. Gordon*, 15 Ariz. 521, 140 P. 496, 501 (1914) ("Whether a payment was made voluntarily or not is a question of law, where the facts are undisputed."); *Eslow v. Albion*, 153 Mich. 720, 117 N.W. 328 (1908) ("The question as to whether the [license] payments were voluntarily made where the facts are undisputed is one of law.").

■■■ The Class contends that attending school is the business of students. It argues that the District's increase in a "mandatory" student services fee meets the business compulsion exception to the voluntary payment rule, as a matter of law, because students who refused to pay the fees "risked complete inability" "to take classes and receive credit therefor in order to obtain a degree." Because the Class asserted that duress was shown as a matter of law by the imposition of the mandatory fees, it contends that it was not necessary to submit evidence of any coercive impact of the fee increase. The District contends that the Class is not entitled to a refund of the fees because the fees were voluntary payments as a matter of law and because the Class introduced no evidence

of duress. Both sides acknowledge that there are no disputed issues of material fact. Therefore, we decide this issue as a matter of law. *See Metro. Life Ins. Co. v. Mann*, 140 Tex. 450, 168 S.W.2d 212, 213 (1943).

The undisputed facts are as follows: The student services fee was increased from a flat fee of $10 per semester to a sliding scale fee of $2 per semester credit hour, with a minimum of $10 and a maximum of $40.[8] The amount of the fee increase is dependent on the number of credit hours taken by the student. Depending on the student's choices, there may be no increase at all or an increase of up to $30. The students also had the option, if they believed that they could not afford the fee, to seek an exemption from all or part of the fee from the District. *See* TEX. EDUC. CODE § 54.503(e) (allowing the District to waive all or part of any compulsory fee for any student facing "undue financial hardship"). The dissent points out that the statute limits actual waivers to ten percent of the student body and thus ninety percent of the quarter of a million members of the class could not benefit from the waiver. The dissent makes an argument that the Class did not. However, if there were evidence that students sought waivers and were denied them, or that the students made any protest at all at the time of payment, the Court's analysis might be different. Perhaps only ten percent of the students could actually be awarded a waiver, but fully one hundred percent could have requested it. The fact that no student sought a waiver supports the conclusion that the fees were voluntarily paid.

---

8. The dissent accuses the District of having "tried to get approval, failed, [and] impos[ing] the fee anyway." This assertion is unsupported by the record. The District contends that it had received proper approval from the student governments. While we do not reach the issue of whether or not the fee was properly approved, none of the parties contend that the fee was not charged in good faith.

The Class asserts that the District's student services fees put students at risk of not being able to take any junior college classes and receive credit. The evidence establishes the contrary. The students had options by which they could avoid paying the increased fee or at least lower the fee and still take college classes. As discussed, students who faced financial hardship could seek an exemption from all or part of the fee. *See* TEX. EDUC. CODE § 54.503(e). Other students, if facing financial hardship, would incur no increase in fees if they enrolled in five credit hours or less. Students could also limit the financial burden of the student services fee by taking fewer than twenty credits. For example, a student taking seven credit hours for the semester would pay $4 in additional student services fees and one taking ten credits would pay $10 more in addition to the tuition.

The Class members by their choices determined the amount of the fee charged and exercised the option of attending a public junior college in the District. Thus, the student taking seven hours would avoid the alleged duress of a $4 increased fee payment by taking five credit hours. The increase in the student services fee may create financial incentives, but such financial incentives or disincentives do not transform a choice into coercion. Payment of the increased fee was not mandatory for any member of the Class; it was contingent on enrollment in a junior college in the Dallas County Community College District and selection of a certain number of credit hours for the semester. In light of the choices the students retained and their right to request a waiver of the fees or otherwise protest the imposition of the fee, any coercion that existed was not actual and imminent and did not constitute duress as a matter of law.[9]

This decision is consistent with our jurisprudence for more than a century. Although the dissent asserts that, "in modern times," we have always "require[d] public agencies to reimburse taxes and fees" that were determined later to be

---

9. Although the Class has not raised any constitutional issues, we point out, contrary to the dissent's assertion, that this holding presents no due process problem. Providing persons who have paid invalid public taxes or fees with recourse to recoupment remedies is a due process requirement. *See Ward v. Bd. of County Comm'rs*, 253 U.S. 17, 24, 40 S.Ct. 419, 64 L.Ed. 751 (1920) ("To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these [plaintiffs] arbitrarily and without due process of law. Of course this would be in contravention of the Fourteenth Amendment, which binds the county as an agency of the State."). Due process requires a "clear and certain" remedy for taxes collected in violation of law. *McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco, Dep't of Bus. Regulation of Fla.*, 496 U.S. 18, 39, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) (state's collection of taxes violated federal law). "A State has the flexibility to provide that remedy before the disputed taxes are paid (predeprivation), after they are paid (postdeprivation), or both." *Reich v. Collins*, 513 U.S. 106, 108, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994); *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 100–01, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); *McKesson*, 496 U.S. at 38, 110 S.Ct. 2238 n. 21. The District satisfies due process requirements in this case. The Class members had several predeprivation remedies; they could seek a waiver of the fee from the District, *see* TEX. EDUC. CODE § 54.503(e), they could file a declaratory judgment action contesting the fee's legality, or they could seek to enjoin collection of the fees, *see Shaw v. Phillips Crane & Rigging, Inc.*, 636 S.W.2d 186, 188 (Tex.1982) (noting that a taxpayer "may bring a suit for declaratory judgment to determine . . . the legality of the taxes" and "may bring a suit to enjoin the collection of the alleged illegal taxes pending a hearing on the legality of same").

void, this statement is simply not true. *See Carrollton–Farmers Branch Ind. Sch. Dist. v. Edgewood Ind. Sch. Dist. (Edgewood III)*, 826 S.W.2d 489, 515–21, 538 (Tex.1992) (rejecting argument by J. Doggett, dissenting, that prior taxes paid should be returned)[10]; *Corsicana Cotton Mills v. Sheppard*, 123 Tex. 352, 71 S.W.2d 247, 249 (1934); *City of Houston v. Feizer*, 76 Tex. 365, 13 S.W. 266, 267–68 (1890); *Galveston City Co. v. City of Galveston*, 56 Tex. 486, 491, 494–495 (1882). This Court has also held that voluntary payment of void taxes and fees is not recoverable. *Corsicana Cotton Mills*, 71 S.W.2d at 249 ("Under the facts detailed above this corporation was a volunteer in paying the taxes here involved. It therefore had no legal claim against the state for their repayment at the time this appropriation was made."); *Feizer*, 13 S.W. at 268 ("the

evidence does not show an involuntary payment"). Rather than challenge the proposition that our precedents refute the contention that public agencies are always required to reimburse payment of void fees, the dissent complains that one of the precedents is old, two others involve voluntary payments and the most recent one, *Edgewood III*, was based on a different ground. To be sure, we do not base the inability to recoup the payments in this case on any philosophical view of the government's entitlement to the funds, but we adhere to longstanding legal precedent and predictability in the law, and acknowledge practical considerations of the public fisc. These holdings recognize the necessity for a governmental authority to be able to rely on a predictable income stream—the very interest that the voluntary payment rule seeks to protect.[11]

**10.** The dissent asserts that the Court makes a mistake in suggesting the reason that we declined in *Edgewood III* to order repayment of the void tax. To the contrary, the dissent here, as the dissent in *Edgewood III*, would allow repayment, and the Court again rejects that result.

**11.** The United States Supreme Court and other jurisdictions have also recognized this need for financial stability in governmental operations. *See e.g., Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 185–86, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) (stating that the Court has "declined to provide retrospective remedies which would substantially disrupt governmental programs and functions" and refusing to require refunds for pre–1987 tax years from a state tax on highway use held unconstitutional); *Gulesian v. Dade County Sch. Bd.*, 281 So.2d 325, 326 (Fla.1973) (refusing to order refund of ad valorem taxes collected under unconstitutional school funding bill because it would cause fiscal chaos, and school boards had relied in good faith on presumptively valid statute); *S. Pac. Co. v. Cochise County*, 92 Ariz. 395, 377 P.2d 770, 778 (1963) (invalidating tax assessment procedure prospectively to avoid "great economic hardship"); *Strickland v. Newton County*, 244 Ga. 54, 258 S.E.2d 132, 133–34 (1979) (prospectively applying invalidation of sales

tax to avoid "unjust results"); *Jacobs v. Lexington–Fayette Urban County Gov't*, 560 S.W.2d 10, 14 (Ky.1977) (refusing to retroactively apply holding invalidating unconstitutional personal property tax to avoid a "chaotic disruption of services" and "a hardship upon all the citizens of that local government"); *Salorio v. Glaser*, 93 N.J. 447, 461 A.2d 1100, 1111, cert. denied, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (prospectively applying invalidation of tax as of six months after decision); *Foss v. City of Rochester*, 65 N.Y.2d 247, 491 N.Y.S.2d 128, 480 N.E.2d 717–24 (1985) (refusing to retroactively invalidate tax because city "would suffer an undue burden if it had to refund the taxes collected"); *Hurd v. City of Buffalo*, 41 A.D.2d 402, 343 N.Y.S.2d 950, 953–54 (1973) (refusing to require refund of unconstitutional tax collected before date of decision), aff'd, 34 N.Y.2d 628, 355 N.Y.S.2d 369, 311 N.E.2d 504 (1974); *Metro. Life Ins. Co. v. Comm'r of Dep't of Ins.*, 373 N.W.2d 399, 412 (N.D.1985) (refusing refund of unconstitutional state tax, to avoid "significant hardship upon the state's existing financial requirements"); *Soo Line R.R. v. State*, 286 N.W.2d 459, 465 (N.D.1979) (prospectively invalidating property tax method prospectively to avoid "chaos" and "because of the hardship which would result"); *Rio Algom Corp. v. San Juan County*, 681 P.2d

The dissent also suggests that today's decision is inconsistent with recent case law and cites several cases in which this Court ordered that government fees be reimbursed. *See, e.g., Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585–86 (Tex.2002); *Camacho v. Samaniego,* 831 S.W.2d 804, 815 (Tex. 1992). The dissent itself refutes the force of these opinions by noting that "these cases all have one thing in common—there is no mention in any of them of voluntary payment as a defense." The parties did not raise the issue of voluntary payment in those cases, and the Court did not address it. *See Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 304 n. 1 (Tex.2004) (noting that the Court does not consider issues not raised by the parties).

Finally, the dissent asserts that "it is hard to see why students should have less protection than bail bondsmen." This statement obfuscates rather than addresses the issue. The students in this case have the same protections under the laws as others who establish duress. In the cases cited by the dissent, it was clear that the harm suffered by the bail bond agents or other professionals was actual and imminent—they would lose their ability to earn a living or do business. In this case, the harm is far more speculative. While the college was authorized to prevent enrollment or to deny credit, it is undisputed that there is no evidence that the college denied either benefit to any student or that it would actually have done so. Furthermore, as noted above, the students had the option to avoid the fee by adjusting their course loads, seeking a waiver or injunction to halt collection of the fees, or seeking other educational opportunities.

No member of the class pursued any of these options.

We conclude that the Class did not establish duress as a matter of law, and that the District established that the student services fee payments were voluntary payments as a matter of law.

## IV. Conclusion

For the reasons stated above, we hold that the Class was not entitled to a refund of the technology fees or a refund of the increase in the student services fee. We reverse the court of appeals' judgment and render judgment that the Class take nothing.

Justice BRISTER filed a dissenting opinion joined by Chief Justice JEFFERSON and Justice O'NEILL.

Justice BRISTER, joined by Chief Justice JEFFERSON and Justice O'NEILL, dissenting.

For the first time in more than a century, this Court says the government need not return illegal fees it has demanded—because all who paid them were volunteers. In modern times we have always held otherwise, requiring public agencies to reimburse taxes and fees they demanded but had no right to collect. As the technology fees at issue in this litigation were proper, I join the Court's opinion and judgment to that extent. But as the remaining fees were not, I respectfully dissent.

The Texas Education Code authorizes colleges to charge a student-services fee for nonacademic activities such as intramural athletics, lecture series, student

---

184, 196 (Utah 1984) (invalidating ad valorem taxes prospectively, except as to plaintiffs); *Bond v. Burrows,* 103 Wash.2d 153, 690 P.2d 1168, 1174 (1984) (denying refund of unconstitutional sales tax to avoid "great financial and administrative hardship"); *Gottlieb v. City of Milwaukee,* 33 Wis.2d 408, 147 N.W.2d 633, 646 (1967) (applying holding on unconstitutional property tax law prospectively to avoid creating fiscal problems).

publications, and student government. TEX. EDUC. CODE § 54.503. But the fee cannot be imposed, nor increased more than 10 percent, without approval by the student body or student government. *Id.* § 54.503(f).[1] The fee increase here was approved at only one of the District's seven campuses; there was no evidence of approval at four others, and a jury found there was no approval at the remaining two.[2] This was no oversight—the District knew about the statute, tried to get approval, failed, imposed it anyway, and now (the Court holds) may keep the proceeds.

The class here represents almost a quarter-of-a-million students. There was no evidence in the summary judgment record about their particular circumstances, and no reason to assume all were the same. On this record, it is impossible to say as a matter of law that *no* student should get a refund (as the Court does), or that *every* student should (as the trial court did).

The Court rejects all refunds based on voluntary payment, an equitable defense arising from the rule that "equity will not aid a volunteer."[3] Neither the rule nor the defense is intended to penalize the public-spirited; it is only those who volunteer *to suffer injury* that equity refuses to reward.

It is only against such volunteers that government entities have successfully invoked the voluntary-payment defense. In both *Corsicana Cotton Mills v. Sheppard,* 123 Tex. 352, 71 S.W.2d 247, 248 (1934) and *Houston v. Feizer,* 76 Tex. 365, 13 S.W. 266, 268 (1890), the taxpayers simply volunteered to pay fees they mistakenly thought they owed, without any assessment or demand from the government.

But as the Court describes in sufficient detail, we have repeatedly rejected any voluntary-payment defense when taxpayers were not volunteers. When a government demands a tax or fee, and could unilaterally assess penalties for noncompliance, those who comply cannot be called volunteers. For them, we have routinely required reimbursement of illegal taxes or fees when a government unit could:

- cancel their right to do business, *see, e.g., Crow v. City of Corpus Christi,* [146 Tex. 558,] 209 S.W.2d 922, 924–25 (1948) (finding fee payment involuntary as city ordinance allowed cancellation of taxi company's franchise); *Metro. Life Ins. Co. of N.Y. v. Mann,* [140 Tex. 450,] 168 S.W.2d 212, 215 (1943) (finding tax payment involuntary as statute allowed cancellation of authority to do business); *Union*

---

1. "If the total compulsory fee charged under this section is more than $150, the increase does not take effect unless the increase is approved by a majority vote of the students voting in an election held for that purpose or by a majority vote of the student government at the institution. In subsequent years, an election authorizing a fee increase must be held before the fee can be increased by more than 10 percent of the fee approved at the last student election." TEX. EDUC. CODE § 54.503(f).

2. For the reasons described by the court of appeals, the District's challenges to these findings should be rejected. *See* 89 S.W.3d at 718–20. So should the District's sovereign immunity defense. *See Shaw v. Phillips Crane*

& *Rigging of San Antonio, Inc.,* 636 S.W.2d 186, 188 (Tex.1982) ("[C]onsent of the Legislature is not required in order to sue the County Tax Assessor–Collector for recovery of an illegal tax involuntarily paid under duress.").

3. *See, e.g., Neves v. Scott,* 54 U.S. 268, 269, 13 How. 268, 14 L.Ed. 140 (1851) ("Courts of equity will not interpose in favor of volunteers"); *United Nat. Ins. Co. v. SST Fitness Corp.,* 309 F.3d 914, 922 (6th Cir.2002); *Murphy v. Stell,* 43 Tex. 123 (1875); RESTATEMENT (FIRST) OF RESTITUTION § 127 reporter's n. cmt. a; RESTATEMENT (SECOND) OF CONTRACTS § 155, comment d; RESTATEMENT (SECOND) OF TRUSTS § 15, comment b.

*Cent. Life Ins. Co. v. Mann*, [138 Tex. 242,] 158 S.W.2d 477, 479 (1941) (same); *Nat'l Biscuit Co. v. State*, [134 Tex. 293,] 135 S.W.2d 687, 691 (1940) (finding tax payments involuntary as statute provided for automatic forfeiture of right to do business, sue, or defend in Texas); or

● assess penalties or interest, *see, e.g.*, *Highland Church of Christ v. Powell*, 640 S.W.2d 235, 237 (Tex.1982) (finding property tax payment involuntary as statute provided for penalties and interest); *State v. Akin Prods. Co.*, 155 Tex. 348, 286 S.W.2d 110, 111–12 (1956) (same); *Nat'l Biscuit Co.*, 135 S.W.2d at 691 (same).

We implied duress in all of these cases, treating each payment as involuntary without requiring particularized proof of interference with any individual taxpayer's free will or judgment. As governments usually have coercive powers, they cannot generally invoke the voluntary-payment rule, or at least have not in recent centuries. Indeed, our cases in which they have successfully done so not only "extend into the nineteenth century" (as the Court says), but appear to be almost entirely limited to it.

The Court says we have allowed governments to demand and keep illegal fees in modern times, citing four cases. In two (as noted above), there was no demand and the taxpayers were complete volunteers; one other counts only if "modern times" includes the presidency of Chester A. Arthur. In the last, *Edgewood III*, we took the unusual step of applying our decision prospectively[4] to avoid "inestimable damage" to the schoolchildren of Texas. *See*

*Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 520–21 (Tex.1992). Accordingly, schools were allowed to keep past taxes because they were *legal* (unaffected by a prospective ruling), not because they were *illegal* but *voluntarily paid*. No one suggests today's decision meets the standards for prospective application; by suggesting instead that *Edgewood III* was a case of voluntary payment, the Court makes the same mistake Justices Doggett and Mauzy did back then. *See id.*, 826 S.W.2d at 538 (Doggett, J., dissenting).

There is no more evidence in this record that reimbursing students for these illegal fees would "disrupt government functioning" than there has been in any of our other recent cases involving illegal taxes and fees, including:

● an $80 fire-registration fee in *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 800–01 (Tex.2005) (reversing dismissal based on limitations, and remanding for further proceedings);

● a $10 bail-bond service charge in *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585–86 (Tex.2002) (finding fee illegal and remanding for reimbursement);

● a $71 filing fee in divorce cases in *Essenburg v. Dallas County*, 988 S.W.2d 188, 189 (Tex.1998) (reversing dismissal based on lack of jurisdiction and remanding for further proceedings);[5]

● a $31 filing fee in *In re Long*, 984 S.W.2d 623, 626 (Tex.1999) (affirming modified contempt order for continued collection of unauthorized fees);[6] and

---

**4.** *Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen*, 952 S.W.2d 454, 503 (Tex. 1997) ("The general rule is that this Court's decisions apply retroactively.").

**5.** For the amount of the *Essenburg* fee, see 1999 WL 298314 at *1 n. 1 (Tex.App.-Dallas, orig.proceeding).

**6.** For the amount of the *Long* fees, see *Dallas County v. Sweitzer*, 881 S.W.2d 757, 762 (Tex. App.-Dallas 1994, writ denied).

- an $18 bail-bond filing fee in *Camacho v. Samaniego*, 831 S.W.2d 804, 815 (Tex. 1992) (finding fee illegal and remanding for reimbursement).

These recent cases all have one thing in common—there is no mention in any of them of voluntary payment as a defense. That governments have not even raised the voluntary-payment defense in any recent cases shows how far back in time the Court reaches to resurrect the defense today.

While we have never addressed voluntary payment or implied duress in the context of college fees, it is hard to see why students should have less protection from illegal fees than bail bondsmen. The Due Process Clause bars a voluntary-payment defense against reimbursement of an illegal business tax;[7] the same Clause ought to bar the same defense against reimbursement of an illegal student fee.[8]

Here, state law provided that students who failed to pay these fees "may be prohibited from registering for classes" and "may be denied credit for the work done that semester." Tex. Educ. Code § 54.007(d). As the students faced a choice between paying the illegal fees or losing one or more semesters of higher education, the rules of implied duress ought to apply.

The Court rejects implied duress here because students could have chosen to take fewer hours or enroll elsewhere. But nothing in the record establishes how many students could afford to prolong their higher education or enroll at other colleges, or how many credits or other opportunities they might lose if they did. More important, implied duress has never required business taxpayers to prove they could not pursue other occupations; these students should not have to do so either.

The Court also says that every student could have requested a waiver of the fees. But waivers were available only for "undue financial hardship," and were capped at 10 percent of the student body. *See* Tex. Educ. Code § 54.503(e). As a matter of law, at least 90 percent of the students could not have obtained a waiver. Further, equity would never demand that taxpayers file a request for exemption from an illegal fee, as "equity follows the law." *See Upson v. Fitzgerald*, 129 Tex. 211, 103 S.W.2d 147, 150 (1937).

Although equity should bar summary judgment for the District, it should also bar summary judgment in favor of the class. *See BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 776–78 (Tex. 2005) (noting that voluntary payment and restitution are both equitable claims). Equity would hardly allow students to enjoy direct benefits from these fees, and then get their fees back too. *See Feizer*, 13 S.W. at 268 (holding voluntary-payment rule barred recovery by butcher who had passed on illegal license fee to his customers); *cf. Akin*

---

**7.** *See McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco, Dep't of Bus. Regulation of Fla.*, 496 U.S. 18, 37, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) ("If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation.").

**8.** *Cf. Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding student had property interest in public education); *Univ. of Texas Med. Sch.v. Than*, 901 S.W.2d 926, 934 (Tex.1995) (holding student had liberty interest in medical education). Implied duress was inapplicable in *BMG Direct Marketing v. Peake* because (1) the private vendor there had to go to court to collect fees, and (2) losing a source for compact discs is not in the same category as losing one's occupation or education. *See* 178 S.W.3d at 776.

*Prods.*, 286 S.W.2d at 112 (requiring reimbursement as any benefits taxpayers received from illegal fee were indirect).

In *Lubbock County v. Trammel's Lubbock Bail Bonds,* we held a $10 bail-bond fee was illegal except to the extent it paid for copies and print-outs the refund claimants actually received. 80 S.W.3d at 583. By comparison, in *State v. Akin Products Co.,* we ordered a full refund when a citrus tax was used to benefit the industry generally rather than the claimant specifically. 286 S.W.2d at 112. Applying those same standards here, students who enjoyed expanded recreational or cultural offerings would not be barred from a refund by receiving such indirect benefits, but those who obtained free textbooks or other direct grants would not be entitled to a refund of what they have, in effect, already received.[9]

The summary judgment record here does not address which students enjoyed such direct benefits. The class representatives claimed not to know which services they used, but almost all of them were involved in student governments that had access to these fees. We should remand and require the class to show they do not already hold these fees in their own hands. *See Truly v. Austin,* 744 S.W.2d 934, 938 (Tex.1988) ("[A] party seeking an equitable remedy must do equity and come to court with clean hands.").[10]

The Texas rule is not, and never has been, that any payment once made cannot be recovered. *See Miga v. Jensen,* 96 S.W.3d 207, 211 (Tex.2002). When the District invoiced students for the increased student-services fee, those who dutifully paid were not volunteers. As the Court concludes otherwise, to that extent I respectfully dissent.

---

9. Further, refunds would be limited to amounts over $11, as an increase of 10 percent was proper without approval of the student body. *See* TEX. EDUC. CODE § 54.503(f).

10. The class argues that the District's objections to the summary judgment are simply an indirect challenge to class certification, which was granted by agreement. But the District's stipulation to certification took place after the trial court granted summary judgment, and expressly reserved the District's right to challenge summary judgment on appeal. Fact questions that would preclude summary judgment for some class members cannot be glossed over simply because the class was certified. *See Sw. Refining Co., Inc. v. Bernal,* 22 S.W.3d 425, 437 (Tex.2000) (stating that class action device "is not meant to alter the parties' burdens of proof"). Nothing in the District's stipulation regarding certification prevented it from objecting that material fact issues precluded summary judgment.