**Reversed and Remanded and Memorandum Opinion filed November 1, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-15-00655-CV

---

### WOODS MFI, LLC AND JOHN S. WOODS, Appellants

### V.

### PLAINSCAPITAL BANK, Appellee

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2014-16866**

---

## M E M O R A N D U M   O P I N I O N

In this dispute between a lender and a borrower/guarantor, the borrower/guarantor asserts the trial court erred in granting summary judgment in favor of the lender. In four issues, the borrower/guarantor contends that (1) the lender, not the borrower, breached the loan agreements or the borrower raised a fact issue precluding summary judgment in favor of the lender; (2) the guarantor of the loan is not liable under the guaranty because the borrower did not breach the loan agreements or the borrower raised a fact issue precluding summary judgment

in favor of the borrower; (3) the judgment disposed of the borrower's fraud and misrepresentation claims although the lender did not present any grounds to defeat these claims in its summary judgment motion; and (4) the attorney's fees awarded to the lender were not segregated.[1] Because we conclude that the borrower raised a genuine issue of material fact precluding summary judgment on the parties' breach of contract claims, we reverse and remand.

## I. Background

In 2011, Woods MFI borrowed $4.125 million from First National Bank (FNB) to purchase and make improvements to a property located on Friar Tuck Lane in Houston (the Friar Tuck property). Woods MFI, through its sole member John S. Woods,[2] signed a Promissory Note, a Loan Agreement, and a Deed of Trust to document the loan (collectively, the Loan Documents). Woods, individually, also signed a Guaranty Agreement, guaranteeing $500,000 of the principal amount, as well as interest and other payments including attorney's fees, in the event of any default on the loan. The Promissory Note provides that Woods MFI was to make monthly interest-only payments on the 25th of each month beginning in February 2011 through January 2014. Additionally, Woods MFI was to make $50,000 principal payments on January 25 in 2012, 2013, and 2014. Thereafter, beginning on February 25, 2014, Woods MFI was to make regular monthly principal and interest payments through the remaining 27-year term of the loan, with a balloon payment due at the end of the loan term.

Shortly after the Loan Documents were executed, FNB's president, Richard Hendee, assisted the Woods Parties in opening a business bank checking account

---

[1] Because these are the issues on which the appellants' briefing focuses, these issues are taken from the argument section of appellants' brief rather than the issues presented section.

[2] For ease of reference, we will refer collectively to Woods MFI and John S. Woods as the "Woods Parties."

under the name "Woods MFI, LLC Friar Tuck House Payment Account" (the Friar Tuck account), through which the first note payment was to be debited. According to Hendee, this account was set up for "automatic debit," but note payments were "done on a manual basis as the loan system would not automatically debit the account because the payment was different each month." Hendee stated that Woods MFI initially deposited $100,000 into this account and the process of Woods MFI depositing funds into the account for debit by FNB to pay the note was in place when Hendee retired from FNB in March 2013.

In September 2013, PlainsCapital acquired Woods MFI's loan—and the accompanying Loan Documents and Woods's Guaranty—from the Federal Deposit Insurance Co. (FDIC) as the receiver for FNB. PlainsCapital also acquired the Friar Tuck account. Woods MFI failed to mail the September 2013 payment to the address specified in the Loan Documents; PlainsCapital sent the Woods Parties a past due notice on September 30. PlainsCapital debited the Friar Tuck account in October for the September note payment. Woods MFI failed to make the October payment to the specified address. PlainsCapital again sent a past due notice to the Woods Parties and debited the Friar Tuck account in November for the October payment. The parties dispute whether these debits to the Friar Tuck account were initiated or authorized by Woods.

Woods MFI failed to mail its November note payment and failed to mail any further payments (other than a payment made pursuant to a court order after this case began). PlainsCapital notified the Woods Parties in writing of Woods MFI's default and sent a demand to cure letter in January 2014, explaining that Woods MFI had failed to make its November and December payments. This letter specified that the outstanding note payments, plus late charges and other charges, should be remitted to the address provided in the Loan Documents. The letter

further notified the Woods Parties that failure to cure within ten days of the date of the letter could result in acceleration of the loan and sale of the property pursuant to the Deed of Trust. Woods MFI failed to remit payment to cure the default, although it had sufficient funds in the Friar Tuck account to cover the defaults at the end of November 2013.

In February 2014, PlainsCapital notified the Woods Parties in writing that, pursuant to the Loan Documents, it was accelerating the Promissory Note. In this letter, PlainsCapital noted:

> [W]e received correspondence from Charles H. Mansour, your attorney, on February 12, 2014, regarding certain wire transfers that were made in the amount of $22,418.00 on October 28, 2013, November 29, 2013 and December 31, 2013 and in January 2014 to the Lender. Representatives of the Lender [PlainsCapital] confirmed that certain amounts have been wired to an account of the Borrower [Woods MFI]; however no instructions were given by the Borrower to transfer all of such funds as payments to the Loan. Therefore, the Loan remains in default.

This letter explained that, because Woods MFI's previously noticed defaults had not been timely cured—even within the additional time that had elapsed before the date of the acceleration letter—the letter served as "formal notice" that the balance due on the note had been accelerated. The letter stated,

> If the entire balance due on the Note, including default interest and all costs and fees incurred in enforcing Lender's rights under the Note and governing Loan [D]ocuments, is not paid in full immediately, Lender intends to pursue its available remedies set out in the Note and the Deed of Trust securing the Note.

Finally, the letter directed the Woods Parties to contact PlainsCapital for payoff information. Charles Mansour, attorney for the Woods Parties, was emailed a copy of this letter.

4

On March 11, PlainsCapital sent the Woods Parties a "notice of sale" letter, explaining that Woods MFI's defaults had not been cured by the date of the letter. PlainsCapital stated that the Friar Tuck property was to be posted for foreclosure sale, unless the entire balance on the note and all costs and fees were paid in full prior to the sale date, April 1, 2014. PlainsCapital also included with the letter a "Notice of Trustee's Sale by Substitute Trustee" and instructed the Woods Parties to contact PlainsCapital for payoff information, "including the legal costs incurred in enforcing the Lender's rights under the Loan [D]ocuments." PlainsCapital emailed this letter to the Woods Parties' attorney, Mansour.

On March 27, Woods MFI filed suit against PlainsCapital, asserting claims for breach of contract, fraud and misrepresentation, declaratory relief, a temporary restraining order to enjoin the foreclosure sale, temporary injunctive relief to prohibit PlainsCapital from foreclosing on the property, and permanent injunctive relief restraining PlainsCapital from foreclosing. The next day, Mansour sent a letter to PlainsCapital via fax and email, requesting that it reinstate "Woods' loan in accordance with his original loan documents."[3] In this letter, Mansour stated, "[M]y client authorizes you to receive the November, December, January, February and March mortgage payments by sweeping the Woods House Payment account. Further, my client will pay the $50,000 principal reduction as well as the property taxes for 2013." This letter provided,

> I reiterate this offer even though our position has always been that Mr. Woods was current on his mortgage at the time [PlainsCapital] sent the Notice of Default.
>
> Logically, my client would not be responsible for any late payment penalties or default interest. Please advise me of [PlainsCapital]'s

---

[3]Both below and on appeal, the Woods Parties make little effort to differentiate between Woods MFI and Woods individually.

5

willingness to reinstate this loan under the aforeferenced [sic] terms which are in accordance with his Note and Deed of Trust.

Please inform me by 12:00 noon, Monday, March 31, 2014, of [PlainsCapital]'s willingness to accept the funds referenced above.

PlainsCapital did not accept the funds offered by Woods MFI, and the suit proceeded.

The trial court granted a temporary restraining order stopping the foreclosure sale set for April 1 and set a hearing on Woods MFI's request for a temporary injunction. On May 1, the trial court signed a temporary injunction order, enjoining PlainsCapital "from foreclosing on [Woods MFI] or posting said property for foreclosure or placing [Woods MFI] in default or taking any other action in furtherance of a foreclosure or pursuit of other remedies contained in the[] Deed of Trust in connection" with the Friar Tuck property. Woods MFI was ordered to pay the 2013 ad valorem property taxes and a $23,183.57 bond into the registry of the court. The case was set for trial in May 2015.

Shortly after the trial court signed the temporary injunction, PlainsCapital filed a counterclaim against the Woods Parties, asserting claims for breach of contract and breach of Woods's guaranty. The Woods Parties filed an amended petition, seeking, in addition to Woods MFI's previous claims, a declaration that the loan was invalid and unenforceable because it was an unconstitutional home equity loan that violated various homestead provisions of the Texas Constitution. The Woods Parties also sought to quiet title to the Friar Tuck property and added additional complaints regarding violations of the Texas constitutional provisions concerning home equity liens, unjust enrichment or money had and received, and economic duress.

PlainsCapital filed a no-evidence motion for summary judgment encompassing all of the Woods Parties' claims; the Woods Parties responded. Our

record does not contain a signed written ruling on this motion. However, on the record from the hearing on this motion, the trial court stated that it was granting the no-evidence motion on Woods MFI's fraud and misrepresentation claims and denying the motion on the Woods Parties' breach of contract claims.

Woods MFI subsequently moved for partial summary judgment, urging that it was entitled to judgment as a matter of law on its breach of contract and declaratory relief claims. First, Woods MFI claimed that it had an automatic-debit agreement (auto-debit agreement) with FNB such that his note payments, including insurance and taxes, were to be automatically debited from the Friar Tuck account via electronic funds transfers. Woods MFI asserted that PlainsCapital was bound by this written agreement, as it "maintained a practice of automatically debiting monthly payments on WOODS MFI, LLC's behalf." Woods MFI alleged in the alternative that, if no written agreement existed, then PlainsCapital's actions in debiting the Friar Tuck account for two months following PlainsCapital's takeover of the loan established a "course of dealing" that "create[d] an implied contract with Woods [MFI] to continue to debit the account each month." Finally, Woods MFI alleged that the language of the Loan Agreement evidenced the parties' intent to enter into an auto-debit agreement. Based on either an express or implied auto-debit agreement, Woods MFI argued that it had fulfilled its payment obligations to PlainsCapital; thus, PlainsCapital breached the Loan Documents, not Woods MFI.

PlainsCapital responded to Woods MFI's motion for partial summary judgment, urging that Woods MFI failed to materially perform under the Promissory Note by not timely making his note payments; Woods MFI did not have an auto-debit agreement; and PlainsCapital and Woods MFI did not have a "course of dealing" that modified the unambiguous written Loan Documents. PlainsCapital also filed its own motion for summary judgment on its breach of

7

contract and guaranty claims. It asserted it was entitled to summary judgment because it established all the elements of its breach of contract claim against Woods MFI, Woods guaranteed payment and performance on the Promissory Note and failed to pay, and the Woods Parties' home equity and constitutional claims lacked merit. The Woods Parties responded to PlainsCapital's summary judgment motion, asserting PlainsCapital had not established its right to summary judgment because the Woods Parties had valid defenses, including payment, waiver, tender, estoppel, and offset, that barred PlainsCapital's claims. The Woods Parties further urged that, because Woods MFI was not in default, Woods likewise had not defaulted on his guaranty.

The trial court heard the parties' competing motions for summary judgment in March 2015. On May 6, the trial court signed a final summary judgment in favor of PlainsCapital, granting PlainsCapital's motion and further ordering that the Woods Parties take-nothing on all

> claims and causes of action asserted against Defendant PlainsCapital Bank, including Declaratory Judgment, Violation of Texas Constitution, Suit[] to Quiet Title, Unjust Enrichment or Action for Money Had and Received, Economic Duress, Breach of Contract (all counts) and *Fraud and Misrepresentation* and all claims of actual damages, exemplary damages, punitive damages, permanent injunctive relief and attorney's fees associated therewith.

(emphasis added). The trial court awarded PlainsCapital (a) $4,810,863.85 in actual damages and $175,908.00 in attorney's fees and costs from Woods MFI, (b) $1,361,130.11 in actual damages and $170,908.00 in attorney's fees and costs from Woods, and (c) various conditional appellate attorney's fees jointly and severally against the Woods Parties.

The Woods Parties filed a verified motion for new trial, urging that PlainsCapital failed to segregate its attorney's fees, the final summary judgment

did not dispose of all of their fraud and misrepresentation claims against PlainsCapital, and that the judgment overstated the amount of damages by not stating that the actual damages up to the amount of Woods' guaranty and the attorney's fees were owed jointly and severally by the Woods Parties. In response, PlainsCapital asserted that (1) the Woods Parties waived their segregation complaint or, alternatively, that it was not required to segregate its fees; (2) the trial court's final judgment encompassed the previously granted no evidence partial summary judgment on the Woods Parties' fraud and misrepresentation claims, which the trial court orally granted in January 2015; and (3) no new trial was necessary because the final judgment did not overstate the actual damages and attorney's fees awarded to PlainsCapital, but if it did, PlainsCapital requested an opportunity to modify the judgment to clarify the amount of damages and attorney's fees awarded.

The Woods Parties' motion for new trial was overruled by operation of law. This appeal timely followed.

## II. Analysis

### A.        Standard of Review

We review de novo the trial court's decision to grant a summary judgment. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009). When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, as here, we consider the summary judgment evidence presented by both sides, determine all questions presented, and if we determine that the trial court erred, render the judgment the trial court should have rendered. *Fed. Deposit Ins. Co. v. Lenk*, 361 S.W.3d 602, 611–12 (Tex. 2012) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) and *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000)).

9

When both parties move for summary judgment, each party must carry its own burden as movant. *See Dallas Cty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 871–72 (Tex. 2005).

The movant for a traditional summary judgment must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A genuine issue of material fact exists if the nonmovant produces evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *See Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

Because the Woods Parties claim that an auto-debit agreement exists by virtue of the Loan Agreement, we must also consider whether the language of this agreement created such an obligation. In construing a contract such as the Loan Agreement, we must ascertain and give effect to the parties' intent as expressed in the contract. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). In determining the parties' intent, we examine and consider the entire contract in an effort to harmonize and give effect to all provisions of the contract so that no provisions are rendered meaningless. *Id.*

With these principles in mind, we turn to the parties' summary judgment motions and the Woods Parties' issues on appeal.[4] First, we determine whether

---

[4] We note that the Woods Parties have not brought forth any substantive arguments on the take-nothing judgment in favor of PlainsCapital on the Woods Parties' declaratory judgment, constitutional, quiet title, unjust enrichment or money had and received, or economic duress claims. Although the Woods Parties mention their declaratory judgment claim, they make no effort to distinguish it from their breach of contract claim or explain how they were entitled to any declarations. It is axiomatic that to obtain reversal on appeal, an appellant must bring forward a "clear and concise argument for the contentions made." Tex. R. App. P. 38.1(i). As no such arguments were made on these claims, the trial court's judgment on them is affirmed, as we note in our conclusion *infra*.

10

summary judgment was properly granted in favor of PlainsCapital, rather than the Woods Parties. We conclude that the Woods Parties raised a genuine issue of material fact, precluding summary judgment on PlainsCapital's breach of contract claims. We then consider the scope of remand because the Woods Parties complain that the trial court granted more relief than PlainsCapital requested in its summary judgment motion. We reverse and remand for proceedings consistent with this opinion.

## B. The Summary Judgment on Breach of Contract

In their first issue, the Woods Parties assert that they, not PlainsCapital, were entitled to summary judgment on the parties' breach of contract claims. The Woods Parties assert that PlainsCapital breached the Loan Documents by refusing to accept payment through either an auto-debit agreement or because Woods MFI tendered payment. Finally, the Woods Parties assert that, at a minimum, they raised a genuine issue of material fact precluding summary judgment in favor of PlainsCapital on PlainsCapital's breach of contract claim. Although we conclude the Woods Parties did not establish their right to summary judgment on their own breach of contract claims, we agree that they raised a fact issue precluding summary judgment in favor of PlainsCapital on PlainsCapital's breach of contract claim.

### 1. *The Loan Agreement does not give rise to an auto-debit obligation*

The Woods Parties first assert that the Loan Agreement "clearly anticipates" Woods MFI making deposits to be disbursed by PlainsCapital to meet Woods MFI's obligations under the Loan Documents. They rely on several provisions of the Loan Agreement in making this argument. First, they point out that the agreement defines "Borrower's Deposit" as "such cash sums as Lender may deem necessary, from time to time until the loan is paid in full, in addition to the Loan,

11

for the payment of the costs of labor materials and services required for the construction of the New Improvements." Next, the Woods Parties emphasize that the Loan Agreement defines "Advance" to mean "a disbursement by Lender of any of the proceeds of the Loan or a disbursement by Lender of any of the Borrower's Deposit." Finally, they rely on paragraph 4.11 of the agreement, which provides as follows:

> Lender shall have the right, but not the obligation, to disburse and directly apply the proceeds of any Advance to the satisfaction of any of Borrower's obligations hereunder. Any Advance by Lender for such purpose, except Borrower's Deposit, shall be part of the Loan and shall be secured by the Loan Documents. Borrower hereby authorizes Lender to hold, use, disburse, and apply the Loan and the Borrower's Loan Deposit for payment of costs of construction of the New Improvements, expenses incident to the Loan and the Property, and the payment of any obligation hereunder. Lender may advance and incur such expenses as Lender deems necessary for the completion of construction of the New Improvements and to preserve the Property, and any other security for the Loan, and such expenses, even though in excess of the Loan, shall be secured by the Loan Documents, and payable to Lender upon demand. Lender may disburse any portion of any Advance at any time, and from time to time, to persons other than Borrower for the purposes specified in this section 4.11 irrespective of the provisions of Section 2.03 hereof, and the amount of Advance to which Borrower shall thereafter be entitled shall be correspondingly reduced.

Based on this section of the Loan Agreement, the Woods Parties assert that PlainsCapital was authorized to disburse funds from the Friar Tuck account. They urge that PlainsCapital's "refusal to do so constitutes a clear breach of the Loan Documents."

We disagree. The plain language of this provision provides that the Lender has the *right*, but not the *obligation*, to disburse and apply proceeds of any advance to satisfy the Borrower's obligations. *See Progressive Cty. Mut. Ins. Co. v. Kelley*,

12

284 S.W.3d 805, 807 (Tex. 2009) (per curiam) (explaining that we begin analysis of the parties' intent with the contract's express language). Even if this provision applies to the Friar Tuck account, an issue we expressly do not reach, this provision simply authorizes, but does not require, PlainsCapital to disburse funds from that account to pay the note. It does not create an auto-debit agreement because it does not oblige PlainsCapital to disburse any funds from Woods MFI's "Borrower's Deposit" account to satisfy Woods MFI's Promissory Note payments. In other words, PlainsCapital's "refusal" to debit the Friar Tuck account on an ongoing basis for Woods MFI's monthly note payments does not constitute a breach of the Loan Agreement because PlainsCapital had no obligation thereunder to do so. *See id.*

Thus, the Loan Agreement provides no basis for Woods MFI's breach of contract claim.

### 2. The Woods Parties failed to raise the "notification" issues in their summary judgment motion

The Woods Parties argued in their summary judgment motion that PlainsCapital's "course of dealing"—two months of debiting the Friar Tuck account following its takeover of the loan—established as a matter of law that the parties had an auto-debit agreement. They further urged in their motion that PlainsCapital was estopped from claiming or had waived any claims that there was no auto-debit agreement. Finally, the Woods Parties asserted in their motion equitable grounds for release. Yet they never made two of the arguments they now make on appeal. They did not assert that PlainsCapital failed to notify Woods MFI that (1) it was the new owner of the Note and (2) it would no longer follow the course of dealings utilizing the Friar Tuck account established by its predecessor FNB. Any issues not expressly presented in the trial court by motion or response cannot be considered by the appellate court as grounds for reversing a summary

13

judgment. *Wells Fargo Bank N.A. v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015) (citing Tex. R. Civ. P. 166a(c)).

Because these issues were not presented below, we do not consider them as grounds for reversal on appeal. *See id.*; *see also Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013); *Haver v. Coats*, 471 S.W.3d 877, 881 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("A reviewing court cannot read between the lines or infer from the pleadings or evidence any grounds for summary judgment other than those expressly set forth in the motion.").

### 3. *Woods MFI did not "tender" payment when it wired money into the Friar Tuck account*

The Woods Parties claim that Woods MFI "tendered" payment to PlainsCapital by wiring sufficient funds into the Friar Tuck account to cover the note payments. First, we note that the Woods Parties' "tender" arguments on appeal do not comport with the arguments they made in response to PlainsCapital's summary judgment motion. In their summary judgment response, Woods MFI asserted as follows:

> Woods [MFI] did not default on the payment of the note because it tendered payment by depositing money in the [PlainsCapital] Account specifically for payment of the note. The account, which was set up by the Bank, was titled "Woods MFI House Payment Account ("The MFI Account"). . . . A valid and legal tender of money consists of the actual production of the funds to pay the debt involved. The tenderer must relinquish possession of the funds under such circumstances as to enable the person to whom it is tendered, without special effort on his part, to acquire possession". *Jensen v. Covington, 234 S.W.3d 198.*

> Woods [MFI] relinquished money when he [sic] deposited it into general deposit account and [PlainsCapital] took title to the money with the right to offset [Woods MFI]'s debt. *Hodge v. Northern Trust Bank of Texas, N.A.*, 54 S.W.3d 518. Moreover, [Woods MFI]'s right to setoff debt with the deposit is absolute

14

without the requirement that he [sic] tender payment first. "The rule is settled that where a depositor is indebted to a bank, and his indebtedness is due, he may offset his deposits against the indebtedness. The right of offset exists without any previous demand being made for the deposit." *Lawrence v. Boles*, 631 S.W.2d 764. Therefore, Woods was current each time he wired money in the account.

On appeal, the Woods Parties contend that, not only was payment tendered when funds were wired into the account, but that their attorney, Mansour, "specifically instructed [PlainsCapital]'s lawyer to withdraw the funds necessary to bring the Note current." As this argument was not raised in the summary judgment proceedings, we do not address it on appeal. *See Wells Fargo Bank N.A.*, 458 S.W.3d at 916. Instead, we focus on that portion of the argument raised below: that Woods MFI's wiring of funds into the Friar Tuck account amounted to a legal tender.

A "tender is an unconditional offer by a debtor to pay another a sum not less in amount than that due on a specified debt." *Jensen v. Covington*, 234 S.W.3d 198, 206 (Tex. App.—Waco 2007, pet. denied) (citing *Baucum v. Great Am. Ins. Co.*, 370 S.W.2d 863, 866 (Tex. 1963)). The funds must actually be produced and the tenderer must relinquish possession of the funds so as to enable the person to whom the tender is made to acquire possession of them without special effort on his part. *See id.*

The Woods Parties assert that, because Woods MFI had sufficient funds in the Friar Tuck account—a business checking account—to make the note payments at issue, Woods MFI effectively paid the note *without PlainsCapital's having any authorization to debit the account.* Assuming, as asserted in Woods MFI's summary judgment response, the Friar Tuck account was a general deposit account, a debtor-creditor relationship was created between PlainsCapital and

Woods MFI. *See Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 606–07 (Tex. 2012). "Given this relationship, a bank may only pay out money in accordance with a customer's order, and also bears the burden of demonstrating proper payment." *Id.* Woods MFI's deposits into the Friar Tuck account could only be paid out in accordance with Woods MFI's orders; these deposits were not an "unconditional offer by a debtor to pay another." *See id.*; *Jensen*, 234 S.W.3d at 206. Thus, Woods MFI did not tender payment to PlainsCapital.

### 4. The Woods Parties raised a fact issue regarding the existence of an auto-debit agreement

PlainsCapital, on the other hand, asserted in its motion for summary judgment that it was entitled to judgment as a matter of law because it established that Woods MFI breached the loan documents. Yet if an auto-debit agreement existed requiring PlainsCapital to debit the Friar Tuck account for Woods MFI's monthly note payments, including ad valorem taxes as claimed by Woods MFI, then PlainsCapital failed to prove that Woods MFI breached the agreement. The following facts support Woods MFI's claim that it had an auto-debit agreement with FNB that transferred to PlainsCapital.

Concerning the auto-debit agreement, Woods testified as follows in his deposition:

A.    It was like a one-page document. *I don't remember. I don't remember.* I know the – the – the point was I – again, it wasn't my idea. It was part of whole system they had set up, so, you know, it would have been just as easy for me to pay the bank than to put the money in that every month, you know.

Q.    Well, Mr. Woods, I'm just trying to find out what you – what you recall about it.

A.    *I don't recall.* I mean, I recall signing the agreement. You know, I remember Mr. Hinde [sic] telling me I had to sign the

16

agreement.  I said how is this going to work.  He told me and I said okay.

Q.    *Do you recall any of the terms of the Agreement?*

A.    *No.*

***

Q.    All right.  Mr. Woods, I'm going to hand you what's marked as Exhibit 6.  Do you recognize that document?

A.    Sure.

Q.    All right.

A.    I do.

Q.    Okay.  And on the – on the lower left-hand side it has the signature for MFI and I believe that – that's you signing on behalf of – of the company; is that right?

A.    Yes, sir.

Q.    All right.  And then on the right side kind of roughly in the middle it has your signature as people who are, I guess, allowed to draw on the account; is that right?

A.    Uhm, yes, sir.

***

Q.    Okay.  Does – does this document refresh your recollection in any way with respect to an auto – automatic debit agreement?

A.    Uhm, *well no.  I mean, kind of. . . .*

*Okay, I remember Dick [Hendee] picked up – and perhaps this is where I signed.  I don't remember.  I mean, I could be making this up.*  I know Dick picked up some information from me after closing at 7 Riverway.  We sat in the conference room there and I signed a couple of things.  I don't know that's where I signed this, probably.  But – but it was right after closing, though, so. . .

Q.    All right.  And also I want to direct you also to that kind of the middle.

A.    Uh-huh.

***

17

Q.    And then, first off, there doesn't appear to be a box there for auto debit agreements.  Do you agree?

A.    That's true.

Q.    All right.  And – and then there's a blank and certainly nothing is filled in there with respect to auto debit agreement or any – or anything at all.

A.    *I guess that's why I signed the auto debit agreement separately.*

Q.    Well, I understand.  But I just want to make sure that – that – that this document here is not something that you're relying upon as a basis for your auto debit agreement?

A.    *No, no.  I signed an auto debit agreement.*

(emphasis added).

Although a written auto-debit agreement was not produced, Woods stated in his affidavit that he "ma[d]e the monthly mortgage payments *through automatic electronic debits* from [his] bank account.  This payment process was set up by Richard Hendee, former President of [FNB]."  (emphasis added).  In turn, Hendee stated in his affidavit as follows:

> [FNB] *opened up a direct debit account for Woods MFI* on or about February 2011.  Woods MFI was to wire money into this (monthly) account and *[FNB] was to debit the applicable monthly payment each month*.  Although the debit account was set up for automatic debit, it was done on a manual basis as the loan system would not automatically debit the account because the payment was different each month.  *Woods made each payment required per the Promissory Note into this account (including taxes and insurance) and the bank debited same each month thereafter.*

> MFI's monthly wire was for more than the estimated interest payment because [FNB] required tax payments to be escrowed each December or January.  [FNB] would also debit Woods MFI's account for the property tax and make the tax payment on behalf of Woods MFI.

> This process was in place when I retired in March 2013 and thereafter to the best of my knowledge.

***

I have attached an email and an open account signature card evidencing the auto debit I set up for Woods at the inception of the loan.

(emphasis added). The attached email, dated February 6, 2011, was from Hendee to Woods, explaining the breakdown for the February 25th monthly payment. In this email, Hendee stated, "The checking account we setup for you to wire funds into is . . . in the name of Woods MFI, LLC Friar Tuck property. We will debit that account on the 25th for the payment." Also attached was the signature card for the Friar Tuck account, described *supra*. Finally, after taking over the loan, PlainsCapital debited two payments from the Friar Tuck account, which Woods averred he did not specifically initiate or authorize. This evidence points to the existence of some sort of auto-debit agreement: an agreement that PlainsCapital apparently honored for at least the first two months following its takeover of the servicing of Woods MFI's loan.

In response, PlainsCapital focused on the language of the Loan Documents, which require that any agreement changing the terms of the loan must be in writing. For example, the Loan Agreement provides, "No provision of this Loan Agreement or the other Loan Documents may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver, or termination is sought to be enforced." PlainsCapital further relied on the statute of frauds, which states that an agreement that will not be performed within one year from the date of making the agreement must be in writing and signed by the party to be bound or by that party's authorized representative. *See* Tex. Bus. & Comm. Code § 26.01(a), (b)(6); *see also Metromarketing Servs., Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 195 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("[W]hen, either because of the

agreement's terms or the nature of the required acts, the agreement cannot be performed within one year, the statute of frauds applies and renders any non-complying agreement unenforceable."). Yet Woods testified that he signed an auto-debit agreement, although in his deposition he could not recall the terms of such a written agreement. In his affidavit, Woods was much more clear about the terms of the auto-debit agreement, stating unequivocally that he paid his monthly mortgage through an automatic debit process that had been set up by FNB's Hendee; Hendee, in turn, confirmed that this process had been set up by FNB.

Finally, PlainsCapital continued with this process for two months when it first took over servicing Woods MFI's loan. And Woods stated definitively that he did not authorize or initiate these specific debits, while on the other hand, PlainsCapital's representative, Craig Cauthen, could only speculate that Woods had done so.

Cauthen further stated,

> As part of my research and review of the loan documents related to the Note, I have not found that [Woods MFI] had signed and delivered an Automatic Transfer Authorization or an agreement similar to it for the purpose of automatically debiting the amount due under the Note from [Woods MFI]'s account on a monthly basis. Due to my research and review of the loan documents related to the loan to [Woods MFI] and the other bank records, neither an automatic debit agreement nor an Automatic Transfer Authorization exists for which [PlainsCapital] could debit, in a uniform fashion, the monthly payments due under the Note from any account of [Woods MFI]. The Account Agreement and Signature Card of [Woods MFI] is not an automatic debit agreement upon which [PlainsCapital] can systematically withdraw funds on a monthly basis from [Woods MFI]'s account for the payment of the Note.

Additionally, PlainsCapital provided copies of numerous past-due notices from FNB that were addressed to Woods MFI. Specifically, the record reflects that FNB

addressed past-due notices to Woods MFI in June 2011, July 2011, August 2011, October 2011, November 2011, February 2012,[5] March 2012, April 2012,[6] May 2012, and June 2012.[7] The record also reflects that Woods MFI made the following note payments by check, drawn on its attorney Mansour's account: February 2011, March 2011, and April 2011. Further, copies of monthly statements from the Friar Tuck account establish that Woods MFI paid its note past the 25th of the month—the payment due date—on numerous occasions. PlainsCapital urged that, based on this evidence of irregular payments and payments made by different methods, it was abundantly clear that no auto-debit agreement existed between Woods MFI and FNB.

Although this evidence calls into doubt the existence of an auto-debit agreement, it was PlainsCapital's burden to establish, as a matter of law, that no such agreement existed. The Woods Parties provided evidence that some type of written auto-debit agreement existed. Indeed, the Woods Parties' actions of continuing to wire money into the Friar Tuck account when notified by PlainsCapital that payments were due could create an inference in a reasonable juror's mind that the Woods Parties expected PlainsCapital to debit these funds to cover the note payments. Certainly, the evidence provided by the Woods Parties, coupled with reasonable inferences drawn from their behavior, could cause reasonable and fair minded jurors to differ in their conclusions about the existence of an auto-debit agreement. *See Hamilton*, 249 S.W.3d at 426.

In sum, the Woods Parties failed to establish their entitlement to judgment as a matter of law on their breach of contract claim; thus, the trial court did not err in

---

[5] A second past-due notice for February 2012 is contained in our record.

[6] Again, there is a second past-due notice in our record for April 2012.

[7] The June notice states that it is a second past-due notice, but our record does not contain the first past-due notice for June.

denying their motion for partial summary judgment. However, the Woods Parties raised a genuine issue of material fact sufficient to preclude summary judgment on PlainsCapital's breach of contract claim against Woods MFI. Because summary judgment on PlainsCapital's breach of contract claim against Woods MFI was inappropriate, summary judgment was likewise inappropriate against Woods on the guaranty claim, as the guaranty claim arose from the breach of contract claim.

For the foregoing reasons, we sustain the Woods Parties' first and second issues to the extent that they raised a fact issue precluding summary judgment in favor of PlainsCapital. We reverse the judgment on the breach of contract and guaranty claims raised by the parties and remand those claims for further proceedings. We turn to the Woods Parties' third issue to clarify the scope of the remand.

## C.      Judgment on Claims Not Raised in Motion

In issue three, the Woods Parties complain that the trial court granted summary judgment on grounds not raised in PlainsCapital's summary judgment motion.[8] Summary judgments may only be granted on grounds expressly asserted in the summary judgment motion. *See G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (citing Tex. R. Civ. P. 166a(c)). Thus, a trial court generally commits reversible error if it grants summary judgment on claims not addressed in the summary judgment motion. *See id.*

PlainsCapital moved for summary judgment on the Woods Parties' claims for breach of contract, injunctive relief, declaratory judgment, violations of the Texas Constitution, claims for quiet title, unjust enrichment or for money had and received, and economic duress. It did not include grounds for relief in its motion

---

[8] As noted *supra*, the Woods Parties raised this complaint in their motion for new trial, thus preserving it for our review.

on the Woods Parties' fraud and misrepresentation claims. PlainsCapital directs us to its previously filed no-evidence motion for summary judgment in which it covered the Woods Parties fraud and misrepresentation claims. This motion was considered on January 26, 2015. The trial court orally granted the motion in part on the Woods Parties' fraud and misrepresentation claims but denied PlainsCapital's motion in part on the Woods Parties' breach of contract claims. No written order memorializing this oral pronouncement is contained in our record.

A judgment is generally rendered when the decision is officially announced orally in open court, by written memorandum filed with the clerk, or otherwise announced publicly *Genesis Producing Co., L.P. v. Smith Big Oil Corp.*, 454 S.W.3d 655, 659 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Garza v. Tex. Alcoholic Beverage Comm'n*, 89 S.W.3d 1, 6 (Tex. 2002)). "The words used by the trial court must clearly indicate the intent to render judgment at the time the words are expressed." *S & A Rest. Corp. v. Leal*, 892 S.W.2d 855, 858 (Tex. 1995) (per curiam). Here, the trial court did not announce an intent to render a final judgment; instead, it disposed of only part of the Woods Parties' claims against PlainsCapital. But the trial court also stated that, although it was denying PlainsCapital's no-evidence motion on the Woods Parties' breach of contract claim, the court would consider a traditional motion on that claim and "take that into consideration with the remainder of the no-evidence."

The remaining summary judgments at issue in this case were considered on March 23, 2015.[9] The final judgment does not refer to PlainsCapital's previously filed no-evidence motion. The first paragraph of the judgment indicates that PlainsCapital's traditional summary judgment motion was under consideration:

---

[9] Although the trial court's judgment only refers to PlainsCapital's motion for summary judgment, the record reflects that both PlainsCapital's motion and the Woods Parties' amended motion were under consideration on that date.

> On March 23, 2015 the Court considered Plains Capital Bank's Motion for Summary Judgment, (hereinafter the "Motion"). After consideration of the Motion, the pleadings on file, the response of the Plaintiff, and the arguments of counsel, the Court finds that the Motion should be and is granted in all things.
>
> IT IS ORDERED, ADJUDGED AND DECREED that Defendant's Motion shall be and is GRANTED.

But the second paragraph of the judgment is more expansive than the first, providing, as excerpted above, that the trial court *further* ordered that the Woods Parties take nothing on, *inter alia*, their fraud and misrepresentation claims. An interlocutory summary judgment order may be reconsidered at any time, without notice to the parties,[10] and the record reflects that the trial court intended to reconsider PlainsCapital's no-evidence motion once PlainsCapital filed its traditional motion. For those reasons and based on the more expansive language in the second paragraph of the judgment, we conclude that the trial court did not grant more relief than was requested when it granted summary judgment on the Woods Parties' fraud and misrepresentation claims.

We accordingly overrule the Woods Parties' third issue.

### III. Conclusion

We have determined that the Woods Parties raised a fact issue precluding summary judgment on PlainsCapital's breach of contract and guaranty claims. We have further concluded that the trial court did not err in granting summary judgment on the Woods Parties fraud and misrepresentation claims because

---

[10] *See, e.g.*, *Rush v. Barrios*, 56 S.W.3d 88, 98 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (explaining that trial court has inherent authority to change or modify an interlocutory order or judgment at any time before the judgment becomes final). "A trial court may, in the exercise of discretion, properly grant summary judgment after having previously denied summary judgment without a motion by or prior notice to the parties, as long as the court retains jurisdiction over the case." *H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 876–77 (Tex. App.—Corpus Christi 1996, writ denied).

24

PlainsCapital previously moved for summary judgment on these claims and the record reflects that the trial court intended to, and did, reconsider and confirm in writing its prior oral ruling. We therefore reverse and remand the breach of contract and guaranty claims, as well as the attorney's fees and damages.[11] The summary judgment on the Woods Parties' other claims is affirmed.


/s/    Sharon McCally
Justice


Panel consists of Justices McCally, Busby, and Brown.

---

[11] The attorney's fees and damages arose from the breach of contract and guaranty claims. Further, our disposition of these issues makes it unnecessary to reach the Woods Parties' fourth issue. *See* Tex. R. App. P. 47.1.